Brandon C. MCGUIRE, Appellant,

v.

STATE of Missouri, Respondent.

No. ED 104028

Missouri Court of Appeals,
Eastern District,
DIVISION FOUR.

FILED: July 5, 2017

Susan L. Hogan, 920 Main St., Suite 500, Kansas City, MO 64105, for appellant.

Josh Hawley, Daniel N. McPherson, P.O. Box 899, Jefferson City, MO 65102, for respondent.

KURT S. ODENWALD, Judge

## Introduction

Brandon McGuire ("McGuire") appeals the motion court's judgment denying his Rule 29.15 [1] motion for post-conviction relief. McGuire's post-conviction motion asserted fifteen claims of ineffective assistance of counsel against defense counsel. On appeal, McGuire argues that the motion court clearly erred in denying five of those ineffective-assistance claims. Under Strickland v. Washington,[2] McGuire bore the burden to demonstrate that defense counsel's performance was constitutionally ineffective *and* that McGuire was prejudiced thereby. We are not firmly convinced that any of McGuire's claims demonstrated both prongs of the Strickland test. Accordingly, the motion court did not clearly err in denying McGuire's motion. We affirm.

## Factual and Procedural History

### I. The Underlying Crimes

On Halloween night, 2006, 16-year-old K.J. attended a party at a community center in St. Louis with her cousin. The two left the party, and K.J. arrived home around 10:00 P.M. K.J., however, did not stay at home long; she received a phone call and left shortly thereafter to catch public transit. K.J. was in a good mood when she left.

---

1. All rule references are to Mo. R. Crim. P. (2016).

2. 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

A witness found K.J.'s body discarded in a dumpster the following morning. K.J.'s bloodied jeans were unfastened and pulled down to her knees; her shirt and sweater were pushed up. Various parts of K.J.'s body were bruised, blackened, and cut. K.J.'s anus was bloody and torn. Based on her body temperature, K.J. had died of mechanical asphyxiation 6-13 hours before her body was found at 9:00 A.M. The injury to her anus indicated that she had been violated with an object sometime near her death, but while she was still alive. DNA swabs of seminal fluid found on K.J.'s body indicated the presence of both male and female DNA—the male was un-identified, but the female profile matched K.J. The police did not charge anyone at the time.

Almost a year later, H.T. was walking late at night down Broadway in St. Louis with some friends. H.T. was in her third trimester of pregnancy. A car pulled up alongside H.T., and the driver asked her if she wanted a ride. Being tired, H.T. accepted. The driver eventually drove down a dead-end street and stopped the car. The driver asked H.T. if she "dated." H.T. took that to be an offer of money for sex. H.T. acknowledged that she had "dated" in the past, but on this night she declined.

The driver lunged at H.T., grabbing her neck with one hand and covering her mouth with the other. The driver climbed on top of H.T., and she blacked out. When H.T. briefly awoke, the driver said, "I killed you, bitch," and H.T. blacked out again. Next thing H.T. knew, she was lying in a puddle of blood on the street, naked from the waist down. Eventually, H.T. flagged down a car in the sparsely populat-ed area. An ambulance was called and H.T. went to the hospital.

H.T.'s injuries were grave. The right side of H.T.'s uterus was torn, along with a main blood vessel, which resulted in bleed-ing to her abdomen. The torn artery also deprived her unborn baby of blood flow, and the baby died.[3] A doctor who treated H.T. testified that her injuries were caused by a blunt object inserted and pushed up into her vagina. That doctor stated that it would be "almost impossible" for a penis to cause such injuries—any suggestion that a penis caused H.T.'s injuries "bord[ered] on almost ridiculous." Seminal fluid was found on H.T.'s clothing and was sent to a crime laboratory.

At some point before November 1, 2007, McGuire's DNA was entered into the CO-DIS database.[4] On November 1, detectives in K.J.'s case learned that McGuire's DNA matched the male sample found on K.J.'s person. Shortly thereafter, detectives in H.T.'s case learned that her jeans con-tained DNA from her, McGuire, an un-known male, and traces of a fourth person.

McGuire was arrested and charged with eight crimes relating to both victims.[5] Re-garding K.J., the State charged McGuire with first-degree murder, forcible rape, and forcible sodomy. Regarding H.T., the State charged McGuire with forcible rape, forcible sodomy, first-degree assault, and kidnapping. The State also charged McGuire with second-degree murder for the death of H.T.'s unborn baby. The case proceeded to a jury trial.

## II. The Trial

During voir dire, defense counsel asked a general question to the venire, and Juror

---

**3.** The baby had cocaine in its system, but that was not the cause of death.

**4.** CODIS stands for Combined DNA Index System, and it is a database containing DNA profiles.

**5.** The State dismissed, by a *nolle prosequi,* a few additional charges.

Tanika Hale ("Juror Hale"), who was an accountant, eventually responded following another juror's answer:

[Defense counsel]: Okay. Now, in the box, I anticipate there is going to be some very graphic testimony about things of a sexual nature, and I address this to everyone in the box at this time and to the people in the front chairs. Will any of you have any difficulty in sitting and listening to testimony from a young woman concerning matters of a **graphic sexual nature**? And the reason I'm asking because some people will, you know, can get turned off and don't want to listen, and if you do, if it's going to bother you, and I anticipate there may be pictures, if it's going to bother you, now is the time to let it be known.

[Defense counsel]: .... Juror Number 601.

[Juror 601]: Yes. I would have a problem with that. The visual aids, I would have a problem.

[Defense counsel]: So you would think that you may be turned off to the point where you may not even listen to the testimony?

[Juror 601]: If it's graphic like that, it might be a stopping point for me.

[Defense counsel]: So you would think that you may be turned off to the point where you may not even listen to the testimony?

[Juror 601]: If it's graphic like that, it might be a stopping point for me.

[Defense counsel]: I understand. Anyone else in the box that feels as Juror 601 feels, that there could be a point where the testimony or the pictures and something that's put forth is of such a nature that it just turns you off and you can't focus on that? Anyone in the pews to my right. Juror 810, please stand.

[**Juror Hale**]: I couldn't do it.

[Defense counsel]: You couldn't do it.

[**Juror Hale**]: No. [Emphasis added.]

No additional questions were asked of Juror Hale about her ability to weigh evidence of a graphic sexual nature. Neither party moved to strike Juror Hale, and she served on petit jury.

After the State's case-in-chief, which was presented in accordance with the facts stated above, McGuire testified in his own defense. During direct examination, defense counsel asked McGuire, "Ever been in trouble with the law before?" McGuire replied, "No." At a subsequent sidebar, the prosecutor argued that defense counsel had opened the door to evidence of McGuire's prior arrest history, which would rebut the testimony that McGuire had never been in trouble with the law. The trial court allowed the prosecutor to inquire on cross-examination into the number of prior arrests, including the dates of the arrests. The trial court did not allow any evidence about the circumstances of those arrests. McGuire was evasive about his prior arrests, but he eventually admitted that he had probably been arrested "twice or more than twice." The prosecutor listed the dates of four arrests, but McGuire said he did not remember those arrests. Because McGuire testified at trial, evidence was also elicited regarding his prior convictions for assaulting a police officer, driving while intoxicated, and possessing a controlled substance.

McGuire's version of Halloween 2006, when K.J. died, was relatively innocent. McGuire remembered trick or treating with his wife and son in the evening. At around 9:30 P.M., McGuire drove his son to his son's mother's house, arriving around 10:00 P.M. Immediately after dropping off his son, McGuire took the long way home to search for a prostitute.

McGuire found K.J., who waved at him. McGuire picked up K.J., had consensual sex with her in the front seat of his car, and left, K.J. was alive, according to McGuire, when he left her. McGuire arrived home "[a]bout 10:45," and did not leave his home for the remainder of the night. (The State's evidence established that K.J. made a phone call around 11:30 P.M.)

McGuire also claimed to have had consensual sex with H.T. shortly before she was attacked. On that early morning, McGuire was cruising around, looking for a prostitute around 4:00 A.M. H.T. was walking on Natural Bridge road near Fairgrounds Park. H.T. flagged McGuire down, asking if he was looking for a "date." McGuire and H.T. agreed to have sex in exchange for a $10 piece of crack. McGuire remembered pulling out of H.T. to ejaculate and finding blood on his hand and penis. McGuire exclaimed, "Oh, hell no. You bleeding. Why are you bleeding?" H.T. replied, "I'm trying to get rid of this baby." Now totally freaked out by H.T., McGuire "opened up the door and pushed her out and drove off." When asked what condition H.T. was in when he left, McGuire explained, "I mean she was fine as far as I know. You know what I mean? I didn't run over her. I'm positive I didn't run over her or anything."

McGuire's wife, Meghan McGuire ("Meghan"), also testified for the defense. Meghan remembered McGuire arriving home on Halloween 2006 at "about 10:45, a little before 11." Meghan stated that she remembered because it was a holiday and that she always got a little jealous when McGuire drove to his son's mother's house, so Meghan always had a "little extra cautio[n]" about how long it would take McGuire to come back home. On cross-examination, Meghan acknowledged that she never told police or prosecutors about this memory when they interviewed her, instead only revealing this memory about two weeks prior to trial.

After evidence concluded, the jury convicted McGuire on seven of the eight counts. The jury acquitted McGuire of forcibly raping H.T. The trial court sentenced McGuire to life in prison without parole for first-degree murder of K.J.; thirty years each for second-degree murder of the unborn baby, forcible rape of K.J., forcible sodomy of K.J., and forcible sodomy of H.T.; and fifteen years each for first-degree assault and kidnapping of H.T. The trial court ran all sentences consecutively. We affirmed in an unpublished opinion on direct appeal. State v. McGuire, 370 S.W.3d 891 (Mo. App. E.D. 2012).

### III. The Post-Conviction Process

McGuire then filed a pro se Rule 29.15 motion for post-conviction relief, which post-conviction counsel subsequently amended. The amended motion asserted 15 claims of ineffective assistance of counsel, five of which relate to this appeal. The motion court denied McGuire's amended motion in full after an evidentiary hearing. We will discuss the evidence from that hearing and the motion court's findings as appropriate within our discussion section. This appeal follows.

### Points on Appeal

Each of McGuire's five points on appeal alleges that the motion court clearly erred in denying him post-conviction relief because defense counsel was ineffective. Point One argues that defense counsel should have attempted to strike Juror Hale because she unequivocally stated during voir dire that she could not listen to testimony or view pictures of a graphic sexual nature. Point Two contends that defense counsel should have requested an instruction, based on MAI-CR 310.10, for-

bidding the jury from considering McGuire's prior convictions as anything but impeachment evidence. Point Three avers that defense counsel's incompetent direct examination of McGuire opened the door to damaging evidence of McGuire's prior arrests. Point Four claims that reasonably competent counsel would have requested an alibi instruction based on McGuire's and Meghan's testimony that he was at home when K.J. was killed. Finally, Point Five asserts that defense counsel should have cross-examined H.T. for bias, because by testifying, she might have been hoping for leniency on an outstanding charge.

### Standard of Review

■ We reverse a motion court's judgment on a Rule 29.15 motion only if the findings of fact and conclusions of law were clearly erroneous. Rule 29.15(k). Clear error occurs only if, after a review of the entire record, we are left with a "definite and firm impression" that the motion court made a mistake. Zink v. State, 278 S.W.3d 170, 175 (Mo. banc 2009). The motion court's judgment must be upheld if it is sustainable on any ground. Swallow v. State, 398 S.W.3d 1, 3 (Mo. banc 2013).

### Discussion

McGuire argues that the motion court clearly erred in denying his Rule 29.15 motion because defense counsel was ineffective for five different reasons. Because all five points rest on our application of the Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), test for ineffective assistance of counsel, we will explore the parameters of that test in the first section. Then, we will discuss each of McGuire's five points in turn.

### I. The Strickland Standard

■ To obtain relief for the ineffective assistance of defense counsel, a post-con-

viction movant must satisfy the two-prong Strickland test by a preponderance of the evidence. Johnson v. State, 406 S.W.3d 892, 898-99 (Mo. banc 2013). The movant must satisfy *both* prongs; if a movant fails to satisfy either prong, the court need not consider the other. Kohlheim v. State, 482 S.W.3d 851, 857 (Mo. App. E.D. 2016).

■ Strickland's first prong addresses trial counsel's performance. The movant must show that defense counsel failed to perform with the level of skill and diligence that a reasonably competent counsel would have exercised in a similar situation. Johnson, 406 S.W.3d at 898-99 (citing Strickland, 466 U.S. at 687, 104 S.Ct. 2052). A movant must overcome the strong presumption that counsel's conduct was reasonable and effective. Smith v. State, 370 S.W.3d 883, 886 (Mo. banc 2012). To overcome this presumption, the movant must point to "specific acts or omissions of counsel that, in light of all the circumstances, fell outside the wide range of professional competent assistance." Zink v. State, 278 S.W.3d 170, 176 (Mo. banc 2009). Strategic trial decisions generally will not support an ineffective-assistance claim; indeed, strategic choices made after a thorough investigation of the relevant facts and law are "virtually unchallengeable." Anderson v. State, 196 S.W.3d 28, 33 (Mo. banc 2006).

Strickland's second prong focuses on prejudice. Prejudice occurs only when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694, 104 S.Ct. 2052. A reasonably probability is one that is sufficient to undermine confidence in the outcome of the trial. Id.

### II. Point One—Failure to Strike Juror Hale

■ McGuire maintains that defense counsel was ineffective for failing to strike,

either for cause or with a peremptory strike, Juror Hale because she unequivocally stated that she "couldn't" focus on evidence of a "graphic sexual nature." Defense counsel's failure to strike Juror Hale, McGuire reasons, violated his right to an impartial jury that would consider all of the evidence.

It is well-settled that a defendant has the right to a fair and impartial jury. White v. State, 290 S.W.3d 162, 165 (Mo. App. E.D. 2009). A defendant must be afforded a full panel of qualified jurors before he or she is required to expend peremptory challenges. James v. State, 222 S.W.3d 302, 305-06 (Mo. App. W.D. 2007). To qualify as a juror, the venireperson must be able to serve on the jury with an open mind, free from bias or prejudice. Id. at 305. Defense counsel's failure to challenge for cause a biased or unqualified juror is ineffective assistance, absent a reasonable trial strategy for keeping that juror on the panel. See James, 222 S.W.3d at 307; White, 290 S.W.3d at 165.

The Strickland standard operates differently when a post-conviction movant alleges ineffective assistance for failing to strike an unqualified juror for cause. In analyzing the performance prong of Strickland, we determine whether the juror was qualified. Pearson v. State, 280 S.W.3d 640, 646 (Mo. App. W.D. 2009). Unqualified jurors are those jurors whose views would substantially impair their ability to perform in accordance with the court's instructions and their oath. Id. (citing State v. Middleton, 995 S.W.2d 443, 460 (Mo. banc 1999)). If the venireperson admitted significant bias and was not rehabilitated in voir dire, counsel's failure to challenge that juror *overcomes the presumption of effectiveness* that we normally afford to defense counsel in the Strickland-performance analysis. Pearson, 280 S.W.3d at 645. If defense counsel failed to strike

an unqualified juror who then served on the petit jury, defense counsel failed to exercise the customary skill and diligence of a reasonably competent attorney, *unless* defense counsel articulates a reasonable trial strategy for keeping the unqualified juror. Id. If no reasonable trial strategy is articulated, the movant has satisfied the performance prong of Strickland. Pearson, 280 S.W.3d at 645. Moreover, where defense counsel unreasonably fails to strike an unqualified juror for cause, the post-conviction movant is entitled to a presumption of Strickland prejudice. James, 222 S.W.3d at 307; White, 290 S.W.3d at 165.

We do not address whether Juror Hale was an unqualified juror. We will assume, without deciding, that Juror Hale was an unqualified juror because she unequivocally stated that she could not view all of the evidence. Nevertheless, we find no clear error in the motion court's finding that defense counsel articulated a reasonable trial strategy for not striking Juror Hale.

The motion court explicitly found defense counsel's testimony to be "highly credible." Defense counsel testified that, in his opinion, Juror Hale's "squeamish" disposition about graphic evidence did *not* mean she would be unfair to McGuire. The motion court found this explanation reasonable. Further, defense counsel credibly testified that he discussed the jury composition with McGuire, who approved of all the jurors who eventually served on the petit jury. Defense counsel's testimony suggests that neither he nor McGuire considered Juror Hale's squeamishness to be a concern at trial.

Beyond defense counsel's minimal concern regarding Juror Hale's fairness, defense counsel further testified regarding his opinion that Juror Hale would have been helpful to the defense. We acknowledge that defense counsel did not remember much about Juror Hale specifically, but the State reminded him about Juror

Hale's demographics. Juror Hale was an accountant with a post-graduate degree. She was single and without children. Defense counsel testified that this case concerned sexual assaults and the murder of an unborn baby and a 16-year-old girl. When asked if having a juror without children would be more beneficial to the defense than someone with children, defense counsel agreed. Defense counsel also testified to his belief that accountants, in his experience, are "very meticulous." Such a meticulous juror might be helpful to the defense in holding the State to its burden of proof in a case based on circumstantial evidence.[6]

McGuire also contends that defense counsel was ineffective for failing to use a peremptory strike on Juror Hale. In addition to the above strategic reasons for not striking Juror Hale, the motion court found defense counsel's testimony to be credible when he stated that other persons on the venire panel were more prejudicial to the defendant. Defense counsel was well within a reasonable trial strategy to exercise his limited peremptory challenges on more worrisome jurors.

Given our record, we are not definitely and firmly convinced that the motion court erred in a finding that defense counsel exercised a reasonable trial strategy by not striking Juror Hale, either for cause or with a peremptory strike. Thus, we cannot find clear error. McGuire has failed to satisfy the performance prong of Strickland. Point One is denied.

## III. Point Two—Failure to Request MAI-CR 3d 310.10

 McGuire testified in his own defense, which opened the door to evidence about his prior convictions. At the instruction conference, defense counsel did not request MAI-CR 3d 310.10, which instructs jurors to consider prior convictions "for the sole purpose of deciding the believability of the defendant and the weight to be given to his testimony and for no other purpose." McGuire argues that defense counsel's failure to request MAI-CR 3d 310.10 was ineffective assistance of counsel.

Our Supreme Court has squarely rejected McGuire's argument. See State v. Shurn, 866 S.W.2d 447, 469 (Mo. banc 1993). In Shurn, the prosecutor asked the defendant about two prior convictions, and the defendant's trial counsel failed to request MAI-CR 3d 310.10. Id. At the motion hearing, trial counsel stated that he did not request the instruction because "he did not want to underscore the prior conviction." The Supreme Court held that this "reasonable trial strategy is not ineffective assistance of counsel." Id.; see also State v. Butler, 904 S.W.2d 68, 73 (Mo. App. E.D. 1995) ("As part of sound trial strategy, counsel may decide not to request MAI-CR3d 310.10 to avoid underscoring the prior guilty plea.").

Here, defense counsel similarly declined to request MAI-CR 3d 310.10. At the motion hearing, defense counsel explained that he did not offer the instruction because he did not want to emphasize McGuire's criminal history: "I wanted the jury not to pay attention to that, so why should I keep bringing it up?" Defense counsel reiterated on cross-examination that he did not offer the instruction be-

---

6. McGuire testified that he told defense counsel at trial that he did not want any rape victims on his jury, which is why he wanted Juror Hale stricken. The motion court flatly rejected this testimony, concluding that there was "nothing in the record to support this belief and [Juror Hale] did not respond [about possibly being a rape victim] when this question was asked of the venire panel." We defer to the motion court's credibility finding.

cause he did not want to "draw attention" to McGuire's prior criminal history. As in Shurn, the motion court did not err, clearly or otherwise, in finding that defense counsel exercised a reasonable trial strategy. Point Two is denied.

## IV. Point Three—Opening the Door to McGuire's Arrest History

 ' During McGuire's testimony, defense counsel asked an open-ended question: "Ever been in trouble with the law before?" McGuire falsely answered, "No." At a subsequent sidebar, the State argued that defense counsel opened the door to McGuire's entire arrest history to rebut his testimony that he had never been in trouble with the law. The trial court allowed limited evidence of McGuire's arrest history. While permitting the State to elicit the number and dates of McGuire's past arrests, the State was not allowed to question McGuire about any substantive details. When the direct examination resumed, McGuire admitted to multiple arrests.

Then, during cross-examination, McGuire admitted that he had been arrested "twice or more than twice." One of those arrests was associated with McGuire's prior conviction for assaulting a law enforcement officer; McGuire had already opened the door to evidence of that arrest and conviction by testifying at trial. The prosecutor identified four additional dates on which McGuire had been arrested.[7] However, the trial court prohibited the State from identifying the reasons for those arrests. McGuire argues that defense counsel's open-ended question, leading to evidence about the number and dates of his prior arrests, constituted ineffective assistance of counsel.

Because we hold that the motion court did not clearly err in finding no Strickland prejudice occurred, we need not address the performance prong of Strickland. Strickland prejudice occurs only when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694, 104 S.Ct. 2052. A reasonably probability exists only if counsel's ineffectiveness undermines confidence in the outcome of the trial. Id.

The essence of this point on appeal relates to defense counsel's "opening the door" to evidence of McGuire's prior arrests. Evidence of McGuire's arrests would have been inadmissible but for defense counsel's broad questioning of whether McGuire had "been in trouble before." We note from the record that the State properly introduced at trial evidence of McGuire's prior convictions for assault on a police officer, driving while intoxicated, and possession of a controlled substance. Defense counsel's questions about McGuire's prior trouble bore no relation to the jury's knowledge of McGuire's three prior convictions. The State would have introduced conviction-related evidence with or without defense counsel's trouble-with-the-law question.

Importantly, defense counsel's trouble-with-the-law question opened the door *only* to evidence of McGuire's prior arrests. And equally important was the trial court's ruling severely limiting what the jury could hear about those prior arrests. The trial court permitted the State to identify the number and dates of McGuire's arrests, nothing else. The jury did not hear the context of those arrests. Thus, because

---

**7.** McGuire testified that he did not remember these individual arrest dates. The dates that the State identified were December 10, 2002; July 20, 2003; September 8, 2006; and September 29, 2006.

of defense counsel's trouble-with-the-law question, the jury heard the dates of McGuire's four prior arrests that did not lead to a conviction.

We are not persuaded that the jury was so impacted upon learning that McGuire had four additional arrests, again, without any information regarding the substance of those arrests, so as to undermine our confidence in the jury's verdict. Our conclusion is supported by two cases in which defense counsel asked effectively the same question of a testifying defendant. See Branyon v. State, 304 S.W.3d 166 (Mo. App. E.D. 2009); State v. Johnson, 841 S.W.2d 298 (Mo. App. S.D. 1992).

In Johnson, a jury found the defendant guilty of attempted forcible rape. 841 S.W.2d at 298. At trial, defense counsel had asked the defendant, "Have you been in trouble before with the law on anything—ever?" Id. at 301. The defendant answered that he had been convicted of second-degree burglary; however, on cross-examination, the trial court allowed the prosecutor to elicit evidence that the defendant had been arrested twice before. Id. In affirming the motion court's finding of no prejudice, the Southern District noted that the arrests were unrelated to the crime at issue, and cross-examination on the arrests was brief and limited in scope. Id. at 301–02. Moreover, the other arrests were not emphasized or alluded to again by the state in witness testimony or closing argument. Id. at 302. Finally, the Southern District found that the evidence supporting the attempted-rape conviction was strong. Id. In addition to witness testimony, the defendant admitted that he was in the bedroom with the victim, he kissed her, he touched her breasts, and he struck her in the face. Id. The Southern District concluded, "When we view the limited evidence of Johnson's two unrelated arrests in light of the entire record, we are confi-

dent there is no reasonable probability that, but for his trial counsel's 'trouble with the law' question and its consequences, the result of the trial would have been different." Id.

We find the prejudice here to be similar to, although slightly greater than, Johnson. In both cases, defense counsel opened the door to evidence about the defendants' prior arrests. The arrests occurred years prior to the crime at issue in the trial. The arrests were unrelated to the charged offenses, and evidence about the arrests was limited in scope to the dates (and not the substance) of the arrests. Further, as in Johnson, the record includes strong evidence connecting McGuire to the scenes of both crimes on the nights they occurred. With regard to K.J.'s death, McGuire admitted that he had consensual sex with her shortly before her death. K.J. was found the next morning with her jeans unfastened and pulled down to her knees, exposing her torso. K.J.'s anus appeared bloody with some tearing; the medical examiner concluded that K.J.'s anus had been violated with a blunt object. The medical examiner also concluded that her injuries were inflicted near the time of death, but while she was alive. Swabs collected from K.J. revealed a mixture of male and female DNA, with the female DNA matching K.J. and the male DNA matching McGuire. With regard to H.T., McGuire again admitted to having consensual sex with her shortly before the crime occurred. McGuire also testified that, after having sex with H.T., he noticed that his hand and genitals contained blood, and he subsequently pushed H.T. out of the car. H.T. identified McGuire as her attacker, and several other witnesses described injuries to H.T. and the death of H.T.'s unborn baby. The evidence to support McGuire's convictions was strong.

We recognize the Johnson court emphasized that the State had not alluded to the prior arrests in closing argument. Here, the prosecutor briefly mentioned McGuire's evasive testimony about his prior arrests in closing arguments, suggesting that McGuire was lying. While this fact may slightly increase the prejudice to McGuire, we remain unconvinced that such prejudice undermined the jury's verdict given the other evidence of McGuire's guilt.

Branyon also supports our finding of no Strickland prejudice. 304 S.W.3d at 167. In Branyon, defense counsel also opened the door to evidence of the defendant's prior arrests by asking him if he had ever been in trouble. Id. On cross-examination, the defendant admitted a prior arrest for what he recalled as "assault of a child." Id. A majority of the court affirmed the motion court's finding of no Strickland prejudice. Id. at 169. In doing so, the majority noted that the State did not emphasize the arrest-related evidence and it was not alluded to again at trial. Id. Further, there was "significant credible evidence" of the defendant's guilt at trial. Id. The dissenting opinion would have found that Strickland prejudice did occur. Id. at 179. The dissent stressed that the case, for child molestation, boiled down to a "he said/she said" scenario for the jury, and that the evidence was not terribly strong. Id. at 175. The dissent also noted that the prior arrest (for "assault of a child") was "of the same nature of the crimes for which [the defendant] was on trial." Id. at 177. Thus, according to the dissent, the prior-arrest evidence substantially increased the likelihood that the jury used those prior arrests when deliberating on the defendant's credibility and guilt. Id.

The prejudice in Branyon, which the majority concluded did not constitute Strickland prejudice, was demonstrably greater than here. Unlike Branyon, McGuire's alleged crimes were not based entirely on "he said/she said" evidence. Physical evidence and McGuire's own testimony put him with the victims, having sex with them, shortly before the crimes happened. The jury did not make its decision based purely on the competing credibility of the victim versus the defendant. Further, unlike in Branyon, where the prior arrest was similar in nature to the prosecuted crime, the jury here was never told the nature of McGuire's arrests. Thus, the evidence was much more similar to Johnson—unspecific, unrelated prior arrests. As such, it is less likely that the evidence of McGuire's prior arrests played a role in the determination of his guilt. Lastly, we note that the jury acquitted McGuire on one count (forcible rape of H.T.). This acquittal suggests that the jury did not use McGuire's prior arrests as propensity evidence to blindly convict him of all crimes with which he was charged. Instead, the jury demonstrated its ability to consider each count individually to determine whether the facts supported a conviction.

In conclusion, the motion court found no reasonable probability that, but for defense counsel's unprofessional errors, the result of the proceeding would have been different. We are not definitely and firmly convinced that the motion court was mistaken in finding no Strickland prejudice. Thus, the motion court's judgment was not clear error. Point Three is denied.

## V. Point Four—Failure to Request an Alibi Instruction

In Point Four, McGuire charges that the motion court clearly erred in finding that defense counsel's failure to request an alibi instruction was neither deficient nor prejudicial. McGuire contends that his testimony, along with Meghan's testimony, provided sufficient evidence to

support an alibi instruction and that he was prejudiced by defense counsel's failure to request that instruction.

McGuire's entire argument asserting prejudice is that, absent an alibi instruction,[8] "the jury was not instructed that the [S]tate was required to prove beyond a reasonable doubt that [McGuire] was present at the time and place when and where the offenses took place." McGuire claims that the jurors, having not been instructed on his alibi defense, "were left free to totally disregard evidence of [his] alibi."

The motion court did not clearly err in finding that no Strickland prejudice resulted from defense counsel's conduct. As stated previously, Strickland prejudice occurs only when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694, 104 S.Ct. 2052. We reject McGuire's claims that, but for the request of an alibi instruction, there is a reasonable probability the result of the proceeding would have been different.

██ An alibi instruction does not change the evidentiary picture or shift the burden of proof. See State v. Phegley, 826 S.W.2d 348, 355 (Mo. App. W.D. 1992). The jury was properly instructed that the State bore the burden of proving every element of the crimes of murder, rape, and sodomy (relating to K.J.) beyond a reasonable doubt, which in this case, necessarily re-

quired the presence of McGuire at the scene of the crimes. For example, the jury instruction on Count I ordered the jury that, to convict McGuire of first-degree murder of K.J., it must "find and believe from the evidence beyond a reasonable doubt" that "between October 31, 2006 and November 1, 2006 in the City of St. Louis, State of Missouri, [McGuire] caused the death of K.J. by strangling her.... However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find [McGuire] not guilty of murder in the first degree." Contrary to McGuire's assertion on appeal, the jury was directed to consider McGuire's evidence in determining whether he was present at the place and time of the crimes. McGuire's proposed alibi instruction was neither required nor necessary for the jury to consider McGuire's alibi evidence. See McClain v. State, 560 S.W.2d 894, 896 (Mo. App. Springfield 1978) (stating that "[i]f the jury was to believe the alibi testimony, an alibi instruction was not an absolute necessity before it could do so.").

Moreover, the evidence presented at trial only minimally supported an alibi instruction. The motion court found that the timeline, both of K.J.'s death and of McGuire's sexual encounter with K.J., was not clear. The motion court also noted that the McGuires were unable to remember many of the details of that night; McGuire

---

8. McGuire's proposed alibi instruction, prepared by post-conviction counsel and modeled after MAI-CR 3d 308.04, reads as follows:

One of the issues under Counts I, II, and [III] in this case is whether the defendant was present at the place where Counts I, II, and III occurred, between October 31, 2006 and November 1, 2006, in the City of St. Louis, State of Missouri.

On that issue, you are instructed as follows:

1. The state has the burden of proving beyond a reasonable doubt that the defendant was present at the time and place the offense is alleged to have been committed.

2. If the evidence in this case leaves in your mind a reasonable doubt that the defendant was present at the place where Counts I, II, and III occurred, between October 31, 2006 and November 1, 2006, in the City of St. Louis, State of Missouri, then you must find the defendant not guilty under Counts I, II, and III.

was arrested over a year after K.J.'s death, and the trial occurred over three years after his arrest. McGuire's definitive assertion that he returned home by 10:45 P.M. on October 31, 2006, and remained at his home thereafter, was belied by his inability to remember many details about that night and other important events during that period.

By way of example, among his many memory failings, McGuire could not recall at trial how old his son was on the night of the crime, the costume his son wore for the Halloween in question, how long he was with K.J., where exactly his sexual encounter with K.J. occurred, and what K.J. was wearing during the encounter. McGuire also did not remember how many times he had been arrested, the year he started dating Meghan, and the year he moved in with Meghan.

Meghan's testimony corroborating McGuire's alibi was similarly tenuous. Meghan could not identify the times McGuire returned home on other holidays and could not recall other details about October 31, 2006. Further, as relayed to the jury during cross-examination, Meghan had not reported this possibly exonerating evidence to the police or the State during the entire investigation into her husband's involvement with K.J.'s brutal murder, despite undergoing questioning by the police. Instead, the basis of Meghan's testimony was only revealed a few weeks before McGuire's trial. Because of the uncertain timeline of K.J.'s death, the weakness of the alibi evidence, and McGuire's admission that he had a sexual encounter with K.J. shortly before her death, it was highly improbable that the result of the trial would have been different with the submission of an alibi instruction.

Nevertheless, defense counsel was able to argue that McGuire was at home when K.J. was killed. In closing argument, de-

fense counsel argued, "Their witness said that ... her boyfriend got a call from her, 11:30. He talked to her. She was alive. My client was at home. His wife got on the stand and told you the reason she knows is why because she is especially conscious when he goes to see his baby mama ... So she knew what time he came back. When he came back home, that young girl was still alive." As a result, defense counsel placed the question of McGuire's presence squarely before the jury, regardless of the presence of the alibi instruction. Cf. State v. Williamson, 877 S.W.2d 258, 261 (Mo. App. W.D. 1994) (noting that, under the circumstances, the failure to offer an alibi instruction was "inconsequential"—the sole issue for the jury to resolve "was whether to believe the prosecution testimony or to believe the defense testimony as to whether defendant committed the offense. An alibi instruction would have made no difference.").

Ultimately, the jury heard and considered McGuire's alibi evidence. The jury heard defense counsel's closing argument in which he attempted to cast doubt on McGuire's presence at the crime scene. After closing argument, the jury was properly instructed that the State bore the burden of proving every element of the charged crimes, which in this case, necessarily required the jury to find McGuire present when the K.J.-related crimes were committed. The jury categorically rejected McGuire's alibi defense. We are not firmly convinced that the motion court made a mistake in ruling that no Strickland prejudice occurred. Point Four is denied.

## VI. Point Five—Failure to Impeach H.T.

Lastly, McGuire's posits that defense counsel was ineffective for failing to cross-examine H.T. about her prior arrests, and whether she testified with an

expectation of leniency on her then-pending charges. McGuire asserts that H.T.'s possible hope for leniency raised the issue of her personal bias, and could cause the jury to discredit her testimony.

 Normally, the extent and manner of cross-examination, including the impeachment of a witness, is a matter of trial strategy. Payne v. State, 509 S.W.3d 830, 836 (Mo. App. W.D. 2016); see also Rousan v. State, 48 S.W.3d 576, 594 (Mo. banc 2001). Therefore, to overcome the presumption that defense counsel exercised a reasonable trial strategy in deciding not to impeach a witness, "a movant must demonstrate that the decision was not a matter of reasonable trial strategy and that the impeachment would have provided him with a defense or would have changed the outcome of trial." Tucker v. State, 468 S.W.3d 468, 474 (Mo. App. E.D. 2015).

 After considering all the circumstances presented at trial, counsel "may fairly determine that the use of certain impeachment evidence may cause his or her client more harm than benefit." King v. State, 505 S.W.3d 419, 424-25 (Mo. App. E.D. 2016). Counsel may make a reasonable strategic choice "to either limit or not impeach a witness at all for fear that doing so would alienate the jury or create sympathy for the State's witnesses[.]" Tramble v. State, 414 S.W.3d 571, 575 (Mo. App. E.D. 2013). Further, counsel is not ineffective for pursuing one reasonable trial strategy to the exclusion of another reasonable trial strategy. Anderson v. State, 196 S.W.3d 28, 33 (Mo. banc 2006).

 Usually, a party "may not impeach a witness's credibility by showing an arrest, investigation or criminal charge that has not resulted in a conviction[.]" State v. Simmons, 944 S.W.2d 165, 179-180 (Mo. banc 1997). However, a party may use such evidence "if the inquiry would demonstrate either (1) a specific interest of the witness; (2) the witness's motivation to testify favorably for the [S]tate; or (3) that the witness testified with an expectation of leniency," Id. at 180. The use of a witness's arrest record is only relevant to the extent that there are pending charges because past arrests, investigations, and charges are not relevant to show a present motivation to testify favorably for the State. Id.

Here, H.T. testified in a pre-trial deposition that she had pending municipal, street-demonstration charges. Defense counsel was aware of this deposition testimony. Defense counsel could have asserted that H.T.'s trial testimony was made in an expectation of favorable treatment on her then-pending charges.

 But defense counsel made a strategic decision not to raise the pending municipal charges during H.T.'s cross-examination. Instead, defense counsel indicated that his focus at trial was to establish H.T.'s regular drug use, that she had ingested cocaine on the day of the crime, that she was a prostitute, and that her trial testimony was inconsistent with her previous statements to police. Defense counsel effectively emphasized those concerns with H.T.'s testimony during cross-examination, and again during closing argument. Defense counsel is not ineffective by choosing to employ one strategy at trial to the exclusion of others. Anderson, 196 S.W.3d at 33.

Further, at the motion hearing, defense counsel expressed his opinion that H.T. warranted special treatment; H.T. had experienced a brutal sexual assault that resulted in the loss of her unborn baby. H.T. cried at several points during her testimony, requiring, in one instance, the trial court to take a recess. Defense counsel noted his concern that additional impeachment may have caused the jury to believe

that he was attacking or badgering H.T. Defense counsel reasonably decided to limit his impeachment of H.T., as a matter of trial strategy, in order to ensure that he would not alienate the jury or create any additional sympathy for H.T. See Tramble, 414 S.W.3d at 575.

McGuire's argument that defense counsel should have presented additional impeachment evidence at trial amounts to nothing more than second-guessing defense counsel. See Payne, 509 S.W.3d at 837. Defense counsel was not ineffective for declining to impeach H.T. in the way that McGuire now demands. Point Five is denied.

### Conclusion

The judgment of the motion court is affirmed.

James M. Dowd, P.J., concurs.

Gary M. Gaertner, Jr., J., concurs.