

# In the Missouri Court of Appeals
# Eastern District

## SPECIAL DIVISION

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | No. ED109743 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court |
| | ) | of the City of St. Louis |
| vs. | ) | 1222-CR02611-01 |
| | ) | |
| ERIC LAWSON, | ) | Honorable Michael W. Noble |
| | ) | |
| Appellant. | ) | FILED:  May 9, 2023 |

### Introduction

Eric Lawson (Appellant) appeals from the judgment convicting him of three counts of murder in the first degree, one count of assault in the first degree, one count of arson in the first degree resulting in death, five associated counts of armed criminal action, and two counts of endangering the welfare of a child in the first degree.  Appellant was sentenced to serve consecutive sentences of life without parole for each offense of first-degree murder, life for the offenses of first-degree assault and first-degree arson resulting in death, 30 years for each of the associated offenses of armed criminal action, and seven years for each offense of endangering the welfare of a child.  For the following reasons, we affirm.

Factual and Procedural Background

Appellant does not challenge the sufficiency of the evidence supporting his convictions. We therefore only briefly summarize the evidence presented at trial, viewed in the light most favorable to the verdict.[1]

Appellant was charged with three counts of first-degree murder, one count of first-degree assault, one count of first-degree arson resulting in death, five associated counts of armed criminal action (ACA), and two counts of first-degree endangering the welfare of a child stemming from the deaths of his former girlfriend, Breiana Ray, her mother, Gwendolyn Ray,[2] and his and Breiana's ten-month-old son, A.L., in addition to injuries to Breiana's three-year-old daughter, M.R.

On the evening of May 5, 2012, Gwendolyn's home was set on fire. First responders were dispatched to the home shortly after 10:00 P.M. Upon entering the home, firefighters found M.R. walking around; she lost consciousness while firefighters rescued her from the home, but was resuscitated by paramedics and taken to the hospital. Firefighters discovered A.L. unconscious next to Breiana, who was dead with an apparent gunshot wound to her head. Gwendolyn was also found dead with an apparent gunshot wound to the head. Firefighters attempted to resuscitate A.L. and he was taken to the hospital, where he died after doctors were unable to resuscitate him. Fire investigators determined that two fires had been intentionally set in the home: one in the living room on the first level of the apartment and one in a bedroom on

---

[1] See State v. Collings, 450 S.W.3d 741, 753 (Mo. banc 2014) (citing State v. McFadden, 369 S.W.3d 727, 736 (Mo. banc 2012)).

[2] To avoid confusion given the shared family name, we refer to members of the Ray family by their first names. In so doing, we intend no disrespect or familiarity.

the second level of the apartment.[3]  The cause of both Breiana's and Gwendolyn's deaths were gunshot wounds to the head, and the cause of A.L.'s death was determined to be smoke inhalation.  Appellant was arrested later that night because a witness placed him as the last individual at the scene of the crimes shortly prior to their commission.  After initially denying his involvement, Appellant confessed to the crimes the following morning.  Ballistics evidence recovered from the crime scene and one victim was later matched to Appellant's firearm.

The State sought the death penalty for the first-degree-murder charges, which were severed from the remaining nine charges for trial.  A jury trial was held in April and May 2021, at which Appellant was found guilty of the three counts of first-degree murder.[4]  The jury rejected the death penalty and returned a verdict recommending sentences of life without parole. The trial court found Appellant guilty of the remaining nine counts after a bench trial,[5] and sentenced Appellant to consecutive sentences of life without parole for each offense of first-degree murder, life for the offenses of first-degree assault and first-degree arson resulting in death, 30 years for each of the associated ACA offenses, and seven years for each offense of endangering the welfare of a child.  This appeal follows.

We include further facts as necessary in our discussion of each of Appellant's points on appeal.

### Discussion

In his seven points on appeal, Appellant presents various challenges to his jury trial of the three murder offenses.  In Point I, Appellant argues his jury panel should have been quashed

---

[3] Gwendolyn's home was a two-story apartment on the second and third levels of a brick building.

[4] Appellant's first trial on these charges resulted in a mistrial due to an inability to seat a sufficient number of jurors.

[5] Appellant waived his right to a trial by jury and the parties stipulated that the entire record of the jury trial proceedings would be admitted into evidence at the bench trial.

because he made a prima facie showing that the pool from which his jury was drawn failed to represent a fair cross-section of the community. In Point II, Appellant challenges the denial of his motion to suppress and the admission at trial of his incriminating statements to law enforcement officers based on a claim that the waiver of his rights was invalid and his statements were coerced. In Point III, Appellant asserts his incriminating statements should have been suppressed because they were the product of an illegal arrest without probable cause. In Point IV, Appellant contends the trial court erred in limiting defense counsel's cross-examination of the lead investigating officer. In Point V, Appellant disputes the admissibility of a video of an attempted Child Advocacy Center interview with the surviving victim of the fire. In Point VI, Appellant claims error in the admission of testimony from physicians who treated the two child victims, one of whom survived the fire. And lastly, in Point VII, Appellant challenges the failure to issue his requested alibi instruction.

For the reasons discussed below, we conclude that none of Appellant's points on appeal are meritorious.

### Fair Cross-Section (Point I)

In his first point, Appellant argues the trial court erred in failing to quash his jury panel because he made a prima facie showing that the pool from which his jury was drawn failed to represent a fair cross-section of the community. We conclude the trial court did not err in failing to quash the jury panel because Appellant did not meet his burden of making this prima facie showing.

As part of the right to a jury trial guaranteed by the Sixth Amendment and the Missouri Constitution, criminal defendants have a right to have a jury panel drawn from a fair cross-

section of the community. State v. Reed, 502 S.W.3d 79, 87 (Mo. App. E.D. 2016) (citing State v. Anderson, 79 S.W.3d 420, 430 (Mo. banc 2002)); see Berghuis v. Smith, 559 U.S. 314, 319 (2010) (citing Taylor v. Louisiana, 419 U.S. 522, 528 (1975)).[6] This right guarantees the *opportunity* for a representative jury and, as such, requires only that "the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." Taylor, 419 U.S. at 538. A defendant establishes a prima facie violation of this fair-cross-section requirement by showing the three Duren[7] factors:

> (1) that the group alleged to be excluded is a "distinctive" group within the community, (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community, and (3) that this under-representation is due to systematic exclusion of the group in the jury selection process.

Reed, 502 S.W.3d at 87 (quoting Anderson, 79 S.W.3d at 430); accord Duren v. Missouri, 439 U.S. 357, 364 (1979). Once a prima facie showing has been made, the burden shifts to the State to show the jury-selection process nonetheless serves to advance a "significant state interest" and is appropriately tailored to do so. Duren, 439 U.S. at 367–68, 370.

We provide de novo review of constitutional challenges such as whether a defendant has sufficiently presented prima facie evidence of a violation of the fair-cross-section requirement. See U.S. v. Reed, 972 F.3d 946, 953 (8th Cir. 2020).

There is no dispute that African Americans, the group alleged to be excluded here, are a "distinctive group within the community" sufficient to meet the first Duren prong of a prima

---

[6] This right is also protected by Missouri statute. See section 494.400, RSMo. (2000); see also State v. Reed, 502 S.W.3d 79, 87 (Mo. App. E.D. 2016).
[7] Duren v. Missouri, 439 U.S. 357 (1979).

facie violation of the fair-cross-section requirement.  See id.; State v. Davis, 646 S.W.2d 871, 875 (Mo. App. W.D. 1982).  The parties dispute the second and third prongs of the Duren test.

We do not address the second Duren prong because Appellant has failed to establish the third prong of a prima facie violation of the fair-cross-section requirement: that any unfair and unreasonable underrepresentation resulted from the jury-selection *system*.  See Duren, 439 U.S. at 364.  Underrepresentation of a distinct group is systematic when it is "inherent in the particular jury-selection process utilized."  Id. at 366.  To meet this third prong, the defendant must identify a specific practice of the jury-selection system and must demonstrate a causal link between the challenged practice and the underrepresentation.  See id.  "Under the test established by Duren, disproportionate exclusion of a distinctive group … need not be intentional to be unconstitutional, but it must be systematic."  Randolph v. People of the State of Cal., 380 F.3d 1133, 1141 (9th Cir. 2004).

On appeal, Appellant identifies one cause of the alleged underrepresentation of African American prospective jurors in St. Louis City's jury selection process, which Appellant argues is systematic: the practices and procedures in relation to undeliverable juror questionnaires.[8] Appellant's claim relies on a data analysis completed by Professor Matt Vogel, a professor of sociology specializing in quantitative criminology, which was reduced to a report covering juror data in St. Louis City from August 2013 to November 2015 (the Vogel Report).[9]  Based on the data in this report, Appellant asserts that, although the juror questionnaires were mailed at

---

[8] Appellant pointed to other causes for the alleged underrepresentation in his arguments before the trial court.  We do not address those arguments here, as they were not raised before this Court.

[9] The record on appeal before this Court does not include the raw data from which Prof. Vogel conducted his analysis.

6

random,[10] questionnaires were deemed "undeliverable" in majority-African American neighborhoods at higher rates than in majority-White neighborhoods.[11] The Vogel Report concluded that 25.39% of the total juror questionnaires were "undeliverable."[12] Prof. Vogel's analysis of these records found that 26.66% of mailings sent to census block-groups with a population over 70% African American were deemed undeliverable, compared to 16.53% in census block-groups with a population over 70% White.[13] Based on this difference, Appellant asserts African American prospective jurors are systematically excluded at this juncture by the jury-selection system.

Appellant has not sufficiently shown a relationship between the alleged underrepresentation of African Americans in the jury pool and the undeliverable practices of the St. Louis City jury-selection system, and therefore has failed to show these undeliverable practices constitute systematic exclusion. Neither Prof. Vogel nor Appellant was able to describe with any certainty the import of the higher rates of undeliverable questionnaires in census block-groups with over 70% African American residents.[14] The data relied upon in the

---

[10] There is no argument that the mailing of jury questionnaires was not random or that it was a systematic cause of any underrepresentation. Indeed, Prof. Vogel himself concluded that "there were no notable disparities in the mailing of juror questionnaire forms in St. Louis City during this time frame," meaning "the process used to generate the master juror list seems to be random."

[11] Given the methods used in this case, Appellant's reference to "neighborhoods" technically refers to census block-groups. A census block-group is the second-smallest geographic unit by which the United States Census gathers demographic information and "encompass[es] around forty blocks and consist[s] of between 600 and 3,000 persons." Prof. Vogel testified that a census block-group consists of "roughly 2,000" individuals. If a census block-group was over 70% African American, Prof. Vogel assigned prospective jurors with an address in that geographic area as African American; the same method was utilized for census block-groups over 70% White. This approach is referred to as "geocoding."

[12] Prof. Vogel analyzed only potential juror entries that could be geocoded—i.e., those that had a "valid" address within the City limits, contained no "misspellings," and were not addressed to a P.O. Box—and removed any records deemed to be duplicates.

[13] If a census block-group did not fit into either of these categories (meaning that it was between 31% and 69% one of these two specific racial categories), Prof. Vogel assigned those records "something other than [B]lack or [W]hite."

[14] Prof. Vogel calculated that 26.66% of juror questionnaires sent to census block-groups with over 70% African American residents were undeliverable, in comparison with 25.39% of the total juror questionnaires.

7

Vogel Report to find the undeliverable percentages also suffered from limitations that further undermine their explanatory power.[15] In Missouri, including one's race on a juror questionnaire is optional and 64.01% of prospective jurors in the City of St. Louis during the relevant time period declined to self-report their race. Due to this lack of self-reported data, the majority of juror records in this case were assigned a race through the application of geocoding[16]—including the 99.93% of juror records marked as "undeliverable" that were missing a self-reported race. Prof. Vogel conceded that the geocoding method "mis-ascribed race" to some records and recognized that approximately 25% of the races assigned to prospective jurors could be mistaken. The Vogel Report also explained that geocoding "rests on the assumption that addresses are both accurate and stable," and therefore "any change in this information undermines the ability to ascribe racial status" to potential jurors. Complicating the application of the geocoding method to this case is the fact that the jury tracking software utilized by the City of St. Louis is a "live" system, meaning that it is consistently and regularly updated and addresses "change on a fairly regular basis."

The regular updating of the juror data in the selection system both undermines the application of the geocoding method and shows how the City worked to increase the representativeness of the master list and jury pools. Cf. Howell v. Superintendent Rockview SCI, 939 F.3d 260, 270 (3rd Cir. 2019) (reforms to increase representativeness of jury lists have some relevance to fair-cross-section analysis). For example, the master jury list is refreshed

---

[15] Prof. Vogel himself recognized and outlined many of these limitations in the section of the Vogel Report listed "Data Limitations."

[16] The geocoding process assigns race based on geographic location. As mentioned in footnote 11, *supra*, Prof. Vogel assigned prospective jurors as African American if they had an address in a census block-group with an African American population of 70% or greater; the same method was utilized for census block-groups over 70% White.

twice a year (in February and in August) with Secretary of State and Department of Revenue data, and is run against the National Change of Address list twice a year and against the Bureau of Vital Records Death Match four times a year.  This process works to ensure the master jury list is updated and accurate, including its addresses.  The City of St. Louis also changed its system for maintaining the master jury list and selecting jurors, moving from the Jury Management System to the Show Me Jury System in April 2017.  The Annual Jury Management Reports from the City of St. Louis Office of the Jury Supervisor show that, since the implementation of this system, fewer juror questionnaires have been returned as undeliverable.[17]  Indeed, Prof. Vogel himself noted the new system does a better job of updating information.

There is insufficient evidence to show that St. Louis City's practices regarding undeliverable juror questionnaires are a systematic cause of the exclusion of African Americans in the jury pool.[18]  We note that other courts have similarly rejected claims of systematic exclusion where the evidence was insufficient to show more than a mere possibility or speculation as to cause.  See Randolph, 380 F.3d at 1140–42 (county's failure to issue summonses to persons who failed to return questionnaire not sufficient, without evidence that underrepresentation was due to that system, to show systematic exclusion); cf. Berghuis, 559 U.S. at 332 ("No 'clearly established' precedent of this Court supports [appellant's] claim that he

---

[17] Annual rates of undeliverable questionnaires have generally trended downwards since implementation of the new jury management system, with the undeliverable percentages as follows: 29.2% in 2013–2014; 22.8% in 2014–2015; 25.0% in 2015–2016; 17.4% in 2016–2017; 14.0% in 2017–2018; and 16.7% in 2018–2019.

[18] We are likewise not persuaded by Appellant's reliance on Prof. Vogel's "Z-score" analyses to establish a sufficient causal link to show systematic exclusion.  Prof. Vogel testified the Z-score analysis "determines the probability of generating a racial composition in a jury pool" by random but does not relate to potential *reasons* for or *causes* of any nonrandomness.  Analytical methods focusing on the randomness of a particular jury composition cannot—alone— show systematic exclusion resulting from the jury-selection process because this process is inherently *nonrandom* in that it considers specific factors in determining disqualification and excusal.

can make out a prima facie case merely by pointing to a host of factors that, individually or in combination, *might* contribute to a group's underrepresentation.").

Given the evidence and arguments presented, we cannot conclude that any underrepresentation is "*inherent* in the particular jury-selection process" by means of the system's undeliverable practices, as required by Duren, 439 U.S. at 366 (emphasis added). Our conclusion aligns with other state and federal courts' holdings that similar practices and procedures do not constitute systematic exclusion inherent in the jury-selection process. See, e.g., State v. Plain, 969 N.W.2d 293, 297–98 (Iowa 2022) (county's failure to update addresses when jury summonses were returned undeliverable, failure to follow up with non-responsive jurors, and failure to hold jurors accountable through enforcement proceedings for not responding or appearing were "run-of-the-mill practices" that did not constitute causal evidence of systematic exclusion as required under third Duren prong); U.S. v. Orange, 447 F.3d 792, 800 (10th Cir. 2006) (finding "[n]one of these purported causes for under-representation constitute systematic exclusion," where causes identified included that "the clerk's office made no effort to update addresses before mailing questionnaires, or any effort to locate those whose questionnaires were returned as undeliverable" and "the minority population was less likely to return the juror questionnaires and the clerk's office takes no further follow-up action.").[19]

Because Appellant has not made a sufficient showing under this third Duren prong, Appellant has failed to establish a prima facie violation of his right to have a jury panel drawn

---

[19] Accord Omotosho v. Giant Eagle, Inc., 997 F.Supp.2d 792, 803, 805–06 (N.D. Ohio 2014) (agreeing with other circuits and holding "that a group is not systematically excluded from the jury selection process when the system of selecting jurors does not proactively counteract the effects of the group's comparably higher rate of mobility") (collecting cases); U.S. v. Rioux, 97 F.3d 648, 658 (2d Cir.1996) ("The inability to serve juror questionnaires because they were returned as undeliverable is not due to the system itself, but to outside forces, such as demographic changes").

from a fair cross-section of the community.  As such, the trial court did not err in failing to quash Appellant's jury panel.

Point I is denied.

### Admission of Appellant's Incriminating Statements (Points II and III)

In his second and third points, Appellant challenges the denial of his motion to suppress and the subsequent admission at trial of his incriminating statements to law enforcement. Appellant contends his statements should have been excluded because: the waiver of his rights was invalid and his statements were coerced by law enforcement (Point II); and his statements were the product of an unlawful arrest without probable cause (Point III).  We disagree and address these points together.

### *Standard of review*

Appellate review of the denial of a motion to suppress is limited to a determination of whether the trial court's decision is supported by substantial evidence.  State v. Wilson, 449 S.W.3d 803, 807 (Mo. App. E.D. 2014) (citing State v. Byrd, 389 S.W.3d 702, 707 (Mo. App. E.D. 2012)).  We will reverse a ruling on a motion to suppress only if it was clearly erroneous. Id. (citing Byrd, 389 S.W.3d at 707).  In our review we consider evidence presented at the pretrial suppression hearing and at trial, viewed in the light most favorable to the ruling.  Id. (citing Byrd, 389 S.W.3d at 707).  If the trial court's ruling is "plausible" in light of this evidence, we will not reverse even if we would have weighed the evidence differently were we in that position.  State v. Dixon, 332 S.W.3d 214, 217–18 (Mo. App. E.D. 2010) (citing State v. Williams, 277 S.W.3d 848, 851 (Mo. App. E.D. 2009)).  While we defer to the trial court on issues of fact and credibility, we review legal determinations and questions of law de novo.

11

Wilson, 449 S.W.3d at 807 (citing Byrd, 389 S.W.3d at 707); State v. Collings, 450 S.W.3d 741, 753 (Mo. banc 2014) (citations omitted).

*Relevant Facts*

On the evening of May 5, 2012, St. Louis Metropolitan Police Department homicide Detective Roger Murphey and his partner were called to the fire after it was identified as a homicide. At the crime scene they spoke with Gwendolyn's brother, who provided Appellant's name and the information that Appellant was the last known person to be at Gwendolyn's home prior to the fire. Around the same time, St. Louis Metropolitan Police Department homicide Detective Wallace Leopold spoke with Teona, the partner of Breiana's sister. Teona had been at Gwendolyn's home earlier that evening and informed Det. Leopold of everyone who had been at Gwendolyn's home. Teona recalled arriving at the apartment between 8:30 and 9:00 P.M., and believed she stayed there for approximately 45 minutes. According to Teona, Appellant was the only person in the home other than the victims when she left. Teona mentioned it was unusual that Appellant's car was not parked in front of the apartment. Although Teona did not witness any argument between Appellant and Breiana while she was there, Teona relayed that Breiana and Appellant "had problems before"—including an incident in which Appellant previously attempted to burn down an apartment where Breiana was living.

Det. Leopold shared this information with Det. Murphey when he returned to police headquarters. After detectives issued a "wanted"[20] for Appellant, Det. Leopold and his partner,

---

[20] A "wanted" is an "electronic notice[]" in use by St. Louis-area law enforcement agencies. A "wanted" is issued by law enforcement and acts as "a law enforcement officer's system-wide notice that the subject is wanted for questioning by an officer, although no warrant is associated with the subject's record." Furlow v. Belmar, 52 F.4th 393, 397 (8th Cir. 2022); see also U.S. v. Smith, 648 F.3d 654, 656 n.2 (8th Cir. 2011) (describing "a 'wanted' as an investigative tool that allows law enforcement to gather information or evidence of a crime and locate people who might have such information or evidence and possibly take them into custody.").

accompanied by uniformed officers, went to Appellant's address with the purpose of arresting him. They arrived around 2:00 A.M. on May 6, 2012, and Appellant answered when Det. Leopold knocked on the front door. Det. Leopold asked Appellant to come outside and explained he was from the police department and they needed to talk with Appellant at police headquarters. Det. Leopold placed Appellant in handcuffs and gave him to uniformed police officers to transport to headquarters. Officer Kyle Bowen picked up Appellant and the uniformed escorting officers around 2:15 A.M., transported them to headquarters in a police van, and dropped Appellant off around 2:30 A.M. Det. Leopold, Officer Bowen, and the uniformed officers did not ask Appellant any questions and Appellant did not ask why he was being handcuffed or what officers wanted to speak with him about; Appellant was not given Miranda[21] warnings at that time.

Det. Murphey had no contact with Appellant until they met in the interview room at police headquarters. Det. Murphey and his partner interviewed Appellant and the entirety of their conversation was recorded. The video recording lasted two hours and 47 minutes, of which Appellant was alone for approximately 45 minutes. During this interview, Appellant was advised of his rights and was given oral Miranda warnings, which he waived and proceeded to speak with detectives. For the first hour and forty minutes of the video, including a total of nearly an hour of active interviewing, Appellant maintained his innocence. After Det. Murphey received a notification on his phone and excused himself from the room—after implying this would be a call relaying that M.R. was awake and had identified Appellant as having hurt her mother—Appellant admitted to his guilt. Appellant first maintained that "voices" in his head,

_____

[21] Miranda v. Arizona, 384 U.S. 436 (1966).

whom he identified as "Jack" and "Jim," shot Breiana and Gwendolyn and lit the fires in the apartment. When further questioned by detectives, Appellant admitted he did not hear these voices and, instead, had gone into a "blind rage" directed at Breiana.

Appellant filed a pretrial motion to suppress his incriminating statements, arguing these statements followed an involuntary and unknowing waiver of his rights; were coerced by detectives; and followed a warrantless arrest without probable cause. The trial court held a hearing on this motion, at which Detectives Murphey and Leopold testified. In denying Appellant's motion, the trial court specifically found their testimony credible. At trial, the court instructed the jury that:

> Evidence has been introduced that the defendant made certain statements relating to the offense for which he is on trial. If you find that a statement was made by the defendant and that the statement was freely and voluntarily made under all of the circumstances surrounding and attending the making of the statement, then you may give it such weight as you believe it deserves in arriving at your verdict. However, if you do not find and believe that the defendant made the statement or if you do not find and believe that the statement was freely and voluntarily made under all of the circumstances surrounding and attending the making of the statement, then you must disregard it and give it no weight in your deliberations.

*Statements as product of invalid waiver of rights and coercion (Point II)*

In his second point on appeal, Appellant articulates a multi-pronged challenge to the admission of his incriminating statements based on a violation of his rights, specifically the privilege against self-incrimination. See U.S. Const. amend. V (providing in pertinent part that "no person … shall be compelled in any criminal case to be a witness against himself"); Mo.

14

Const. art. I, section 19 (providing in pertinent part that "no personal shall be compelled to testify against himself in a criminal case").[22]

In the present case, we are not convinced that the <u>Miranda</u> warnings were improperly given or that Appellant unknowingly or involuntarily waived his right to remain silent. Nor are we left with a definite and firm impression that the totality of the circumstances surrounding Appellant's confession deprived him of his free will and forced him to confess. As such, the trial court did not err in denying his motion to suppress or in admitting his confession at trial.

### 1. Waiver of rights

First, Appellant argues his statements should have been suppressed and not admitted at trial because they were not obtained after a voluntary, knowing, and intelligent waiver of his rights. We disagree.

Due to the inherently coercive nature of custodial interrogation, an individual must receive specific warnings about her or his rights prior to questioning. <u>State v. Sparkling</u>, 363 S.W.3d 46, 49 (Mo. App. W.D. 2011) (citing <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966)). "[A] person in police custody must be warned prior to an interrogation that he has the right to remain silent, that anything he says could be used against him in a court of law, that he has the right to an attorney, and that if he cannot afford an attorney one will be appointed for him ('<u>Miranda </u>warnings')." <u>Wilson</u>, 449 S.W.3d at 807 (citing <u>Miranda</u>, 384 U.S. at 478–79). "Statements obtained during a custodial interrogation not preceded by <u>Miranda</u> warnings are subject to suppression at trial." <u>Id.</u> (quoting <u>Collings</u>, 450 S.W.3d at 753).

---

[22] "[T]he protection against compelled self-incrimination afforded by the state constitution is coextensive with the right recognized in the federal constitution." <u>State v. Mack</u>, 560 S.W.3d 29, 33 (Mo. App. W.D. 2018) (quoting <u>State v. O'Neal</u>, 392 S.W.3d 556, 566 n.8 (Mo. App. W.D. 2013)).

15

When <u>Miranda</u> warnings are properly given, "an accused may knowingly and intelligently waive his rights and agree to answer questions or make a statement." <u>Id.</u> (citing <u>Miranda</u>, 384 U.S. at 479). We determine whether a valid waiver occurred under the totality of the circumstances surrounding the interrogation. <u>Sparkling</u>, 363 S.W.3d at 50 (citing <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986)).

In the present case, the trial court did not err in concluding Appellant was properly advised of his rights and was timely given <u>Miranda</u> warnings. The trial court found the evidence showed Appellant was not questioned by police until he was transported to police headquarters. This is a factual finding involving witness credibility, which we will not overturn unless it is clearly erroneous—which it is not. <u>See id.</u> at 51 (citing <u>State v. Powell</u>, 798 S.W.2d 709, 713 (Mo. banc 1990)). At the suppression hearing, Det. Leopold testified he did not ask Appellant any questions and Appellant did not ask him any questions after Appellant was arrested and placed in handcuffs. The officer who transported Appellant to police headquarters confirmed that no law enforcement officer conversed with Appellant after he was arrested or during his transportation to headquarters. And those officers who did converse with Appellant prior to giving him <u>Miranda</u> warnings did not engage in interrogation. The record shows that detectives gave Appellant <u>Miranda</u> warnings prior to engaging in questioning designed to elicit an incriminating response and hours prior to Appellant confessing to the charged crimes. As such, the fact that law enforcement did not advise Appellant of his rights until after general background questioning was not improper and does not necessitate the suppression of his subsequent incriminating statements made after he was advised of his rights and waived his right

16

to remain silent.[23]  See Wilson, 449 S.W.3d at 808–10 (citations omitted); State v. Hughes, 272

S.W.3d 246, 255–57 (Mo. App. W.D. 2008).

The trial court also did not err in finding Appellant knowingly, intelligently, and

voluntarily waived his rights and confessed to the charged crimes.  There are two "distinct

dimensions" of a valid waiver:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.

Sparkling, 363 S.W.3d at 50 (quoting Moran, 475 U.S. at 421).  A proper waiver of rights occurs

where the totality of the circumstances demonstrates both a free choice and the requisite level of

comprehension.  State v. Mendez-Ulloa, 525 S.W.3d 585, 592 (Mo. App. E.D. 2017) (citing

Moran, 475 U.S. at 421).

In deciding whether a waiver was knowing and intelligent, we examine the totality of the

circumstances surrounding the interrogation, "including the background, experience, and conduct

of the accused."  State v. Watkins, 618 S.W.3d 265, 269 (Mo. App. E.D. 2021) (quoting Edwards

v. Arizona, 451 U.S. 477, 482 (1981)).  "A knowing and intelligent waiver is 'normally shown

by having a police officer testify that he read the accused his rights, asked whether the rights

---

[23] There is no argument or supportive evidence in the record that law enforcement utilized the "two-step interrogation" technique criticized in Missouri v. Seibert, 542 U.S. 600 (2004).  "A 'two-step interrogation' is 'a police protocol for custodial interrogation that calls for giving no warnings of the right to remain silent and counsel until interrogation has produced a confession ... then [issuing] Miranda warnings ... then lead[ing] the suspect to cover the same ground a second time.'"  Collings, 450 S.W.3d at 755 (quoting Seibert, 542 U.S. at 604).  When this technique is employed "in a calculated way to undermine the Miranda warning," the repeated incriminating statements may be inadmissible.  Id. (citing State v. Gaw, 285 S.W.3d 318, 322–23 (Mo. banc 2009)).  Here, nothing in the record indicates that detectives intended to or did circumvent the protections of Miranda v. Arizona, 384 U.S. 436 (1966).

17

were understood, and received an affirmative response." Id. (quoting State v. Wise, 879 S.W.2d 494, 505 (Mo. banc 1994)).[24]

In the present case, Det. Murphey advised Appellant of his Miranda rights, asked whether he understood those rights, and obtained an affirmative response. At the suppression hearing, Det. Murphey testified he verified Appellant's level of education and he believed Appellant completely understood the rights of which he was advised. The record shows Appellant spoke and understood English, had graduated high school, and was attending college seeking a liberal arts degree. And during the interview, detectives asked Appellant detailed questions about whether he was under the influence of medications or other substances, which Appellant denied. Our review of the videotape reveals Appellant was articulate and alert throughout the interview, including attempting to place blame for the offenses on "voices" in his head that he later admitted to fabricating. The totality of the circumstances supports the trial court's finding that Appellant's waiver of his rights was knowing and intelligent. See id. at 269–70.

Appellant argues his waiver was involuntary in that it was coerced because Det. Murphey made waiving his rights and speaking with detectives a condition of receiving information about his son, A.L.[25] We are not convinced Appellant's waiver was involuntary. Det. Murphey's

---

[24] Overruled on other grounds by Joy v. Morrison, 254 S.W.3d 885, 888 n.7 (Mo. banc 2008)).
[25] Appellant specifically points to the following exchange:
    MURPHEY: Well, you got a son?
    APPELLANT: Yes, sir.
    ***
    MURPHEY: … Now we're gonna have to, uh – we need to talk to you about [A.L.], okay?
    APPELLANT: What's the matter with [A.L.]?
    MURPHEY: I'm gonna need to talk to you, about [A.L.]. Alright? I'm gonna read your – advise you of your Miranda warnings right now, okay? Alright? You understand that?
    APPELLANT: Yes, sir.
    MURPHEY: [reads Miranda rights]. You understand that?
    APPELLANT: Yes, sir.

18

statements did not explicitly make the waiver of Appellant's rights a condition of receiving information about A.L., and detectives did not refuse to provide information about A.L. unless Appellant spoke with them or relinquished his right to have a lawyer present. The record supports that Appellant understood his rights, was coherent and alert throughout the interview, and made no indication he was unwilling to speak with detectives. Instead, he proceeded to speak with detectives and, as explained below, make a voluntary confession. The totality of the circumstances supports the trial court's finding that Appellant's waiver of his rights was voluntary and not coerced. See Berghuis v. Thompkins, 560 U.S. 370, 384, 389 (2010) (where a Miranda warning was given and was understood by the accused, "an accused's uncoerced statement establishes an implied waiver of the right to remain silent").

### 2. Voluntary confession

Appellant also argues his statements should have been suppressed because the totality of the circumstances demonstrates that coercive law enforcement conduct rendered Appellant's confession involuntary. We disagree.

"To prove that a defendant's statements to the police are admissible at trial, the State must show: (1) the challenged statements complied with Miranda's guidelines; and (2) the statements were voluntarily made." Wilson, 449 S.W.3d at 807 (citing Collings, 450 S.W.3d at 753). An incriminating statement is involuntary when the totality of the circumstances "created a physical or psychological coercion sufficient to deprive the defendant of a free choice to admit, deny, or refuse to answer the examiner's questions." Reed, 502 S.W.3d at 84 (quoting State v.

---

MURPHEY: Okay. Knowing, uh – knowing these rights and understanding these rights, do you wish to talk to me today, uh, about what's going on with [A.L.]?
APPELLANT: Yes, sir.

19

Faruqi, 344 S.W.3d 193, 203 (Mo. banc 2011)). In our analysis, we consider both the characteristics of the individual being questioned and the circumstances surrounding the confession. Id. (citing Faruqi, 344 S.W.3d at 203). For instance, we look to the individual's age, experience, intelligence, gender, education, specific susceptibility to coercion, and physical and mental state. See id. (citing State v. Bates, 464 S.W.3d 257, 263 (Mo. App. E.D. 2015)). Among other factors regarding the circumstances surrounding the confession, we look to whether the individual was sufficiently advised of her or his rights, the length and nature of questioning, the presence of police coercion or intimidation, and the withholding of food, water, or other physical needs. Id. (citing Bates, 464 S.W.3d at 263). No single factor is dispositive in this totality-of-the-circumstances inquiry. Id. (citing Bates, 464 S.W.3d at 263).

Here, the totality of the circumstances demonstrates Appellant's confession was voluntary and was not the product of police coercion.

First, there is no indication that Appellant's characteristics, physical or mental state, or physical needs affected the voluntariness of his statements. See id.; Dixon, 332 S.W.3d at 218; State v. Perdomo-Paz, 471 S.W.3d 749, 759 (Mo. App. W.D. 2015). Appellant was a young adult male who was a current college student. He denied being under the influence of medications or other substances in response to detailed questions. Although Appellant was questioned between approximately 2:30 A.M. and 5:00 A.M. and had not slept since the late morning of the previous day, Appellant responded coherently to questions and there is no indication that this affected his behavior or that he requested to sleep. Similarly, although Appellant was handcuffed to the floor throughout the interview, this is a common practice for the security of those conducting the questioning and, alone, does not create a coercive force

20

sufficient to overcome Appellant's will. And although Appellant did ask if he could get something to drink, he asked this question while alone outside the presence of detectives; as such, he was not deprived by his questioners of food or water.

Second, as explained *supra*, Appellant made the incriminating statements after a valid waiver of his rights. See Reed, 502 S.W.3d at 84; State v. Little, 473 S.W.3d 662, 668 (Mo. App. E.D. 2015). And after Appellant began making incriminating statements, Det. Murphey reminded Appellant of those rights. At no point did Appellant request an attorney or suggest he wished to stop the questioning.

Third, the length of the interview—approximately two hours and 45 minutes, with approximately two hours of active questioning—does not suggest Appellant's will was overborne. See Little, 473 S.W.3d at 668 (4 hours and 20 minutes in interrogation room with approximately 1 hour active questioning was "not unduly long"); Reed, 502 S.W.3d at 85 (6 hours in interview room with active interrogation for 2 hours was "in and of itself, insufficient to overcome [defendant's] free will"); Perdomo-Paz, 471 S.W.3d at 759 (3-hour questioning with a break was "not coercive"); Dixon, 332 S.W.3d at 219 (interview of 1 hour and 45 minutes was "short").

Fourth, the record does not reveal that detectives engaged in psychological coercion sufficient to render Appellant's confession involuntary. Here, Appellant complains primarily of three categories of interview tactics: maximization and intimidation; minimization and rapport-building; and mischaracterization of evidence. Conduct that Appellant characterizes as maximization or intimidation was not sufficient to coerce Appellant's confession. Detectives emphasized the severity of the crimes and their possible consequences but did not threaten or

21

raise their voices at Appellant. Such action was not sufficient to deprive Appellant of his free will and coerce his confession. See Dixon, 332 S.W.3d at 219–21; Little, 473 S.W.3d at 668–69. Likewise, conduct that Appellant characterizes as minimization or rapport-building was not sufficient to coerce Appellant's confession. Detectives presented themselves as sympathetic to Appellant, but their conduct was not sufficient to deprive Appellant of his free will and coerce his confession. See Little, 473 S.W.3d at 668–69. And detectives' statements encouraging Appellant to be honest with himself and detectives were not improper promises of leniency. See id. Further, detectives' mischaracterization of the evidence against Appellant was not improperly deceptive police conduct sufficient to coerce Appellant's confession. Misleading a suspect does not render a confession involuntary unless the overall impact of the questioning is improperly coercive, and here we are not convinced that detectives' false representations were so inherently coercive as to create a false confession. See Perdomo-Paz, 471 S.W.3d at 759.

Lastly, other facts support the conclusion that Appellant's confession was voluntary. Specifically, Appellant attempted to direct blame for committing the crimes on "voices" in his head, whom he called "Jack" and "Jim." At one point in the interview, Appellant asked "Jack" for details of the crime and later spoke in "Jim's" voice, refusing to respond to the name "Eric." Appellant clearly explained that he was "too smart" to use his own gun to "do anything stupid," and therefore one of the voices must have committed the crimes instead. When further questioned by detectives, however, Appellant acknowledged he did not hear voices and, instead, admitted he went into a "blind rage" directed at Breiana. Appellant's conduct in fabricating a story that shifted blame from himself supports the finding that his will was not overborne in the interview. See Dixon, 332 S.W.3d at 219–21 (defendant "mak[ing] up another story about how

22

the [victim] was injured" supported finding his will was not overborn by law enforcement techniques).

Given all of the above, we conclude substantial evidence existed to support the trial court's finding that the totality of the circumstances showed Appellant's will was not overborn and his confession was voluntary.

Point II is denied.

*Statements as product of unlawful warrantless arrest (Point III)*

In his third point on appeal, Appellant argues his incriminating statements should have been suppressed because they were the product of his unlawful warrantless arrest.[26] See U.S. Const. amend. IV (providing in pertinent part that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated"); Mo. Const. art. I, section 15 (providing in pertinent part that "the people shall be secure in their persons, papers, homes, effects, and electronic communications and data, from unreasonable searches and seizures").[27] We disagree.

In the present case, Appellant was "seized" for constitutional purposes when he was handcuffed by Det. Leopold outside his home. See State v. Jackson, 686 S.W.2d 21, 23 (Mo. App. E.D. 1984). Whether this seizure was reasonable depends upon whether probable cause

---

[26] A voluntary incriminating statement may still warrant suppression if it was the product of an unlawful arrest. See State v. Harrington, 756 S.W.2d 647, 649 (Mo. App. E.D. 1988).

[27] These rights are coextensive and our analysis is identical under the United States or Missouri Constitutions. State v. Esmerovic, 544 S.W.3d 695, 698 (Mo. App. E.D. 2018) (citing State v. Cook, 273 S.W.3d 562, 569 (Mo. App. E.D. 2008)).

existed for Appellant's arrest.[28] See State v. Esmerovic, 544 S.W.3d 695, 698 (Mo. App. E.D. 2018) (citing State v. Pate, 469 S.W.3d 904, 910 (Mo. App. E.D. 2015)).

"Probable cause to arrest exists when the facts and circumstances within the knowledge of the arresting officers, and of which they have reasonably trustworthy information, are sufficient to warrant a belief by a person of reasonable caution that the person to be arrested has committed a crime." Jackson, 686 S.W.2d at 23 (citing State v. Reynolds, 619 S.W.2d 741, 746 (Mo. banc 1981)). "[A]n arresting officer ... can develop probable cause by considering all the information known to the officer, including hearsay statements." State v. Shoemaker, 448 S.W.3d 853, 860 (Mo. App. W.D. 2014) (citation omitted). The probable cause determination is made based upon the facts and circumstances known to the arresting officer(s) at the time of the arrest. Esmerovic, 544 S.W.3d at 698 (citing State v. Johnson, 463 S.W.2d 785, 787 (Mo. 1971)). We are mindful that this determination should be made upon "the factual and practical considerations of everyday life on which reasonable and prudent [persons], not legal technicians, act." Id. (quoting Johnson, 463 S.W.2d at 787).

Here, Det. Leopold was informed by Teona, a member of the victims' family, that Appellant was the last known individual other than the victims at the apartment on the night of the crimes, and Teona's timeline placed Appellant in the home very near the time of the crimes. Teona also mentioned Appellant's vehicle had not been parked in its usual spot in front of Gwendolyn's home, Appellant and Breiana had previously had issues, and Appellant had attempted to burn down one of Breiana's prior apartments. Viewing the facts in the light most

---

[28] Although law enforcement had issued a "wanted" for Appellant, a wanted is not a warrant. See footnote 20, *supra*. As such, Appellant's arrest was a warrantless one and we consider its legality in that light. See Esmerovic, 544 S.W.3d at 698 (citing State v. Pate, 469 S.W.3d 904, 910 (Mo. App. E.D. 2015)).

favorable to the ruling, we find these facts to be reasonably trustworthy and sufficient to cause a person of reasonable caution to believe Appellant had committed an offense. See id. at 698–99; State v. Witte, 37 S.W.3d 378, 382 (Mo. App. S.D. 2001); State v. Ware, 793 S.W.2d 412, 414 (Mo. App. E.D. 1990).

Point III is denied.

<u>Limitation on Cross-examination of Detective Murphey (Point IV)</u>

In his fourth point, Appellant argues the trial court erred in limiting defense counsel's cross-examination of the lead investigating officer, Det. Murphey. Appellant specifically complains of the trial court prohibiting Appellant from asking about a personal social media post by Det. Murphey; Det. Murphey's involuntary reassignment from the homicide division; and Det. Murphey's presence on the St. Louis City Circuit Attorney's Office "exclusion(ary) list."[29]

*Preservation of claims of error*

We first address whether Appellant has preserved his claims of error for our review. To preserve a claim of error regarding the exclusion of evidence at trial, the proponent of the evidence must make an offer of proof establishing what the evidence would have been, its purpose and object, and each fact essential to establishing its admissibility. State v. Brand, 544 S.W.3d 284, 289 (Mo. App. E.D. 2018) (citing State v. Peters, 186 S.W.3d 774, 781 (Mo. App. W.D. 2006)). An offer of proof is "preferably" made in question-and-answer format, although "a specific narrative offer of proof summarizing the proposed testimony is acceptable in some situations." State v. Childs, 257 S.W.3d 655, 658 (Mo. App. W.D. 2008) (citing State v.

---

[29] The "exclusion(ary) list" was a list maintained by the Circuit Attorney of the City of St. Louis comprised of law enforcement officers from whom the Office would not receive cases based on the Office's belief that the officers were not credible.

25

Pisciotta, 968 S.W.2d 185, 189 (Mo. App. W.D. 1998)). Regardless of form, the offer of proof must be specific and sufficiently detailed—"mere conclusions of counsel will not suffice." Brand, 544 S.W.3d at 289 (quoting State v. Townsend, 737 S.W.2d 191, 192 (Mo. banc 1987)).

Here, after Det. Murphey had finished testifying, defense counsel proceeded to make an offer of proof. Det. Murphey was available and waited outside the courtroom after his testimony. Nevertheless, defense counsel elected to make a narrative offer of proof that did not include any questions to or answers from Det. Murphey.

We conclude that defense counsel's narrative offer of proof was only sufficient to preserve Appellant's claim regarding the Internal Affairs Department (IAD) investigation relating to Det. Murphey's involuntary reassignment from the homicide division resulting from a recording incident. Defense counsel's offer of proof specifically referenced this investigation and Det. Murphey's reassignment from the homicide division. Thanks to extensive pretrial argument and the trial court's *in camera* review of the IAD files and a deposition transcript from Det. Murphey in an unrelated case, the parties and the trial court were familiar with the content and relevance of the excluded evidence, even in the absence of specific testimony from Det. Murphey himself. See State v. Joiner, 823 S.W.2d 50, 52 (Mo. App. E.D. 1991).

By contrast, the narrative offer of proof was insufficient to preserve for our review the claims in relation to the Office of the Circuit Attorney's "exclusion(ary) list" and the IAD investigation relating to the social media post. Defense counsel did not attempt to offer the exclusionary list or other evidence showing Det. Murphey was on this list into evidence. And the offer of proof was simply to "go[] into the line of questioning about" Det. Murphey's

26

awareness of the "exclusion(ary) list." There is no indication what this questioning would show. Based on this record, we would be left to speculate as to precisely what evidence defense counsel would have elicited or attempted to elicit from Det. Murphey, its specificity, and its relevance. Further, Appellant's offer of proof wholly failed to even reference Det. Murphey's social media post or the IAD investigation thereinto. Under these circumstances, the narrative offer of proof was insufficient to preserve for our review Appellant's claims regarding the "exclusion(ary) list" and the social media post. See Brand, 544 S.W.3d at 290; State v. Nettles, 481 S.W.3d 62, 72 (Mo. App. E.D. 2015).

We review Appellant's preserved claim for an abuse of discretion. See State v. Raines, 118 S.W.3d 205, 213–14 (Mo. App. W.D. 2003) (citing State v. Dunn, 817 S.W.2d 241, 245 (Mo. banc 1991)). But we may only review his unpreserved claims for plain error, if at all. See Brand, 544 S.W.3d at 290.

*No error in limitation on cross-examination of Detective Murphey*

As discussed below, we find no error in the trial court's limitations on Appellant's cross-examination of Det. Murphey.

　　1. Preserved error: IAD investigation into recording and transfer from homicide

A trial court has "broad discretion to limit the scope of cross-examination." Raines, 118 S.W.3d at 213 (citing Dunn, 817 S.W.2d at 245). A trial court abuses its discretion when its ruling is clearly against the logic of the circumstances then before the court and is so unreasonable and arbitrary as to indicate a lack of careful consideration. State v. Perkins, 656 S.W.3d 285, 294 (Mo. App. E.D. 2022) (citing State v. Zink, 181 S.W.3d 66, 72 (Mo. banc 2005)). "[I]f reasonable [persons] can differ about the propriety of the action taken by the trial

27

court, then it cannot be said that the trial court abused its discretion." Id. at 295 (quoting State v. Brown, 939 S.W.2d 882, 883–84 (Mo. banc 1997)). Our review of an evidentiary decision is for prejudice, not mere error. Id. (citing State v. Taylor, 588 S.W.3d 631, 637 (Mo. App. W.D. 2019)). The erroneous exclusion of evidence in a criminal case creates a presumption of prejudice that the State may rebut by proving that the error was harmless beyond a reasonable doubt. Id. (citations omitted).

To be admissible, evidence must be both logically and legally relevant. Brand, 544 S.W.3d at 291 (citing State v. Anderson, 76 S.W.3d 275, 276 (Mo. banc 2002)). "Evidence is logically relevant if it tends to make the existence of a material fact more or less probable." Id. (quoting Anderson, 76 S.W.3d at 276). A witness's credibility and bias in relation to a party are logically relevant. Perkins, 656 S.W.3d at 294 (citing Taylor, 588 S.W.3d at 637); Raines, 118 S.W.3d at 212–13 (citations omitted). Despite such logical relevance, the trial court is empowered to limit inquiry into bias and credibility in relation to its legal relevance. Raines, 118 S.W.3d at 213–14. "Legal relevance weighs the probative value of the evidence against its costs—unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time, or cumulativeness." Brand, 544 S.W.3d at 291 (quoting Anderson, 76 S.W.3d at 276). In this way, the trial court retains "wide latitude … to impose reasonable limits on ... cross examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness'[s] safety, or interrogation that is repetitive or only marginally relevant." Raines, 118 S.W.3d at 213–14 (citation omitted).

In this case, we conclude the trial court did not abuse its discretion in limiting Appellant's cross-examination of Det. Murphey regarding Det. Murphey's transfer from the homicide

28

division and the related IAD investigation. The record reveals the trial court did not prevent Appellant from asking whether Det. Murphey had been transferred from homicide in August of 2019. Appellant was only prevented from inquiring into the reason therefor, which the record reveals was due to a miscommunication with another officer regarding non-police work.[30] The trial court reviewed the IAD investigation file related to this incident and determined the Police Department deemed the incident "not sustained" and Det. Murphey received no disciplinary action. The parties and the court also clarified that Det. Murphey's new position was not a demotion or lower rank, and was simply a different job description.

We do not believe it was an abuse of discretion for the trial court to determine the excluded evidence—namely, any reason for Det. Murphey's reassignment from homicide—was not relevant. There was no evidence that this reassignment was related to any misconduct or that the August 2019 reassignment was in any way related to a reason that Det. Murphey would have been biased against Appellant seven years prior to the reassignment. It is not difficult to imagine potential confusion of the issues stemming from this questioning, of which Appellant has not convinced us of the logical relevance. The trial court did not abuse its discretion in limiting the scope of cross-examination in this manner. See Raines, 118 S.W.3d at 214; Perkins, 656 S.W.3d at 297–98.

---

[30] The record reveals that Det. Murphey made a comment that a call with another officer was "recorded," which the officer took to mean that Det. Murphey was surreptitiously recording him; Det. Murphey, however, was referring to the fact that his cellular phone records a log of every call made.

2. <u>Unpreserved errors: placement on Circuit Attorney's Office "exclusion(ary) list" and IAD investigation into social media post</u>

Appellant requests plain error review under Rule 30.20[31] in the event we find his claims of error not properly preserved, as we did *supra*. Rule 30.20 provides that, "[w]hether briefed or not, plain errors affecting substantial rights may be considered in the discretion of the court when the court finds that manifest injustice or miscarriage of justice has resulted therefrom." Rule 30.20; <u>see also</u> <u>Brand</u>, 544 S.W.3d at 290. Plain errors are only those that are "evident, obvious, and clear." <u>Brand</u>, 544 S.W.3d at 290 (citing <u>State v. Baumruk</u>, 280 S.W.3d 600, 607 (Mo. banc 2009)). Unless we believe the claimed error "facially establishes substantial grounds for believing a manifest injustice or miscarriage of justice has resulted," we "should not exercise our discretion to conduct a plain-error review." <u>Id.</u> (citing <u>State v. Jensen</u>, 524 S.W.3d 33, 42 (Mo. banc 2017)). "[T]he defendant bears the burden of establishing manifest injustice." <u>Id.</u> at 291 (quoting <u>State v. Baxter</u>, 204 S.W.3d 650, 652 (Mo. banc 2006)).

Regarding the "exclusion(ary) list," Appellant emphasizes the relevance of Det. Murphey's presence on the list and the reasons for this list, which was, as applicable here, maintained by a Circuit Attorney first elected over four years after the offenses for which Appellant was charged. But the record does not reveal evidence of Det. Murphey's presence on the list or of his specific knowledge of the contents and reasons for the list, and Appellant has not presented this Court with any argument as to how the trial court's limitation on cross-examination on this issue affected Appellant's trial or defense.

---

[31] All rule references are to the Missouri Supreme Court Rules (2022).

Regarding Det. Murphey's social media post, the record reveals an IAD investigation was launched after certain social media posts were identified by the Plain View Project.[32] The post at issue appeared to be in relation to 2017 protests in the St. Louis area in response to the acquittal of Jason Stockley.[33] After extensive argument, the trial court specifically found the post was not racist and did not show "racially-biased behavior." The trial court also reviewed the IAD investigation file related to this post and determined the Police Department deemed the incident "not sustained" and Det. Murphey "received no disciplinary actions." Appellant has not sufficiently argued the linkage between this evidence—a social media post five years after the investigation at issue—and any potential bias. See Perkins, 656 S.W.3d at 297 ("The range of external circumstances from which probable bias may be inferred is infinite.... [But, in] general, these circumstances should have some clearly apparent force ... or, should not be too remote.") (quoting State v. Foster, 854 S.W.2d 1, 4 (Mo. App. W.D. 1993)).

We are not persuaded that any error here was "evident, obvious, and clear" or facially establishes substantial grounds for believing manifest injustice resulted, and we therefore decline to exercise plain-error review of these claims. See id.; Nettles, 481 S.W.3d at 72–73.

The trial court did not err, plainly or otherwise, in placing the complained-of limits on Appellant's cross-examination of Det. Murphey. Moreover, we are not convinced Appellant was prejudiced by these limits, given the overwhelming evidence of his guilt: witnesses placed

---

[32] According to its website, the Plain View Project "is a database of public Facebook posts and comments made by current and former police officers from several jurisdictions across the United States." See plainviewproject.org.

[33] From discussion about this post in the record, it appears that Det. Murphey posted the following on his personal social media account: a statement that referenced protests following the acquittal of Jason Stockley, a White police officer, of the charge of first-degree murder of Anthony Lamar Smith, an African American motorist, as "protesting for a violent thug," in addition to referring to then-mayor Lyda Krewson as "Lying Lyda" and Circuit Attorney Kimberly Gardner as "kimmy g."

Appellant as the last non-victim individual at the scene of the crimes shortly prior to their commission; ballistics evidence recovered from the crime scene and one victim matched Appellant's firearm; and Appellant confessed to the crimes. Given this evidence, any erroneous limitation on Det. Murphey's cross-examination does not constitute reversible error. See Raines, 118 S.W.3d at 214–15.

Point IV is denied.

Admission of Evidence Relating to Victim who Survived Fire (Points V and VI)

In Appellant's fifth and sixth points on appeal, he contends the trial court erred in admitting evidence relating to M.R., specifically: the video of M.R.'s Child Advocacy Center interview (Point V); and testimony from M.R.'s treating physicians (Point VI). We disagree and address these points together.

Our standard of review for evidentiary error is the same as described in Appellant's fourth point on appeal for preserved errors, see supra. The only difference in our analysis regards prejudice. Here, in the case of the admission of evidence rather than its exclusion, an error is prejudicial if there is a reasonable probability that the error affected the outcome of trial. Perkins, 656 S.W.3d at 302 (citing State v. Forrest, 183 S.W.3d 218, 223–24 (Mo. banc 2006)). As previously stated, trial courts retain wide discretion over issues of relevance and the admissibility of evidence. Id. at 294 (citing Zink, 181 S.W.3d at 72). To be admissible, evidence must be both logically and legally relevant. Brand, 544 S.W.3d at 291 (citing Anderson, 76 S.W.3d at 276). "Evidence is logically relevant if it tends to make the existence of a material fact more or less probable." Id. (quoting Anderson, 76 S.W.3d at 276). Evidence is legally relevant if its probative value outweighs "its costs—unfair prejudice, confusion of the

32

issues, misleading the jury, undue delay, waste of time, or cumulativeness." Id. at 291 (quoting Anderson, 76 S.W.3d at 276).

In this case, we conclude the trial court did not abuse its discretion in admitting the video of M.R.'s first CAC interview or the testimony from M.R.'s treating physicians in that this evidence was logically and legally relevant and not otherwise inadmissible. The video admitted depicts an interview of M.R. at the Child Advocacy Center (CAC) on May 11, 2012. The video lasts a total of approximately 10 minutes, of which M.R. is shown for one-and-a-half minutes and an empty room is shown for eight-and-a-half minutes. M.R. does not engage with the CAC interviewer. At trial, the pediatric emergency medicine physician who treated both A.L. and M.R. testified to their treatment and the effects of the fire. The pediatric pulmonologist testified that many factors can contribute to the effects of fire on a child, including distance from the fire, the conditions of the room, the size of the fire, the material burning, and the child's level of consciousness.

The trial court did not abuse its discretion in finding this evidence was logically relevant. The physician testimony assisted the jury in understanding the effects of fire on children and how the fire led to A.L.'s death. The CAC interview video corroborated the CAC interviewer's testimony and was relevant to show the thoroughness of law enforcement's investigation by attempting to interview the surviving witness to the crimes, especially in light of the fact that the adequacy of this investigation was a principal issue in the case and was a main component of the theory of defense. The complained-of evidence was thus logically relevant. See Anderson, 76 S.W.3d at 276–77. And, given that the State bears the burden of proving guilt beyond a reasonable doubt, it "should not be unduly limited" in the manner by which it satisfies this

33

quantum of proof. State v. Anderson, 306 S.W.3d 529, 538 (Mo. banc 2010) (quoting State v. Smith, 32 S.W.3d 532, 546 (Mo. banc 2000)).

In addition, the trial court weighed this logical relevance against any prejudicial effect by limiting the evidence admitted. The trial court admitted the video of M.R.'s first attempted CAC interview but excluded the video of M.R.'s second CAC interview, and admonished the State that any testimony from the treating physicians must be focused on "exposure, and movement, and those types of things." In admitting the evidence relating to M.R. with these boundaries, the trial court properly balanced the probative value of this evidence against its potential prejudicial effect. See Perkins, 656 S.W.3d at 298 ("The balancing of the probative value and prejudicial effect of evidence rests within the sound discretion of the trial court, which is in the best position to make a determination.") (citations omitted). The slight prejudicial effect from the brief video of the CAC interview and the brief, non-graphic testimony regarding M.R. was outweighed by its probative value and therefore the evidence was legally relevant. See State v. Miller, 372 S.W.3d 455, 474 (Mo. banc 2012).

Appellant also contends this evidence was inadmissible because it related to crimes that were not at issue in his jury trial, thus violating his right to be tried only on the crimes charged. This argument hinges on the fact that this evidence related to M.R., who was a victim of the first-degree assault and other charges that were severed from the three first-degree murder charges at trial. We agree that a criminal defendant has a right to be tried and found guilty only of the offense for which he is charged and on trial. See State v. Madrigal, 652 S.W.3d 758, 772 (Mo. App. E.D. 2022) (citing State v. Conley, 873 S.W.2d 233, 236 (Mo. banc 1994)). Evidence of uncharged crimes may be admissible, however, where such crimes "are part of the circumstances

34

or the sequence of events surrounding the offense charged" and help "present the jury a complete and coherent picture of the charged crimes." State v. Johnson, 207 S.W.3d 24, 42 (Mo. banc 2006) (quoting State v. Morrow, 968 S.W.2d 100, 107 (Mo. banc 1998)). The evidence here was admissible for that reason. See id. The CAC video and physician testimony helped establish the thoroughness of the investigation into the crimes at issue at trial and assisted the jury in understanding the effects of a fire on children, which were issues at trial. See Madrigal, 652 S.W.3d at 774–75. Further, the crimes of which M.R. was a victim were the exact crimes that resulted in the death of A.L., and occurred in an uninterrupted sequence with the crimes that resulted in the deaths of Gwendolyn and Breiana. See id.; Morrow, 968 S.W.2d at 107.

The trial court did not abuse its discretion in admitting this evidence.[34]

Points V and VI are denied.

### Failure to Give Alibi Instruction (Point VII)

In his seventh and final point, Appellant challenges the failure to issue his requested alibi instruction. We find no reversible error.

*Standard of review*

A criminal defendant "is entitled to an instruction … if there is substantial evidence to support the theory propounded in the requested instruction[.]" State v. Barnett, 577 S.W.3d 124, 126 (Mo. banc 2019) (citing State v. Bidstrup, 140 S.W. 904, 907 (Mo. 1911)). We review de novo a trial court's decision whether to give a requested jury instruction. See State v. Plunkett,

---

[34] Appellant analogizes his case to that of State v. Matthews, in which the Western District of this Court found an abuse of discretion in admitting prejudicial evidence about exotic reptiles kept in the defendant's house. 552 S.W.3d 543, 545–47, 556–61 (Mo. App. W.D. 2018). Matthews does not aid Appellant because the circumstances of that case are distinguishable from those here, both in terms of the extent of the evidence introduced and its prominence and use within the State's case.

473 S.W.3d 166, 171–72 (Mo. App. W.D. 2015) (citing <u>Cluck v. Union Pac. R. Co.</u>, 367 S.W.3d 25, 32 (Mo. banc 2012)). We will only reverse the judgment "when there is a reasonable probability that the trial court's error affected the outcome at trial." <u>Id.</u> at 172 (quoting <u>Anderson</u>, 306 S.W.3d at 534).

*Relevant Facts*

Prior to trial, Appellant submitted his notice of alibi that, at the time of the offenses, Appellant "was either in his vehicle between the addresses of 2145 South Jefferson, St. Louis Missouri and 4898 San Francisco, St. Louis, Missouri or at 4898 San Francisco, St. Louis, Missouri."[35] The trial court refused to give either of the alibi instructions proffered by Appellant. These proposed instructions read as follows, with one including a time and one including only the specified date:[36]

> One of the issues in this case is whether the defendant was present at 2145 S. Jefferson on May 5, 2012 at 9:55 p.m. On that issue, you are instructed as follows:
> 1. The state has the bur[den][37] of proving beyond a reasonable doubt that the defendant was present at the time and place the offense is alleged to have been committed.
> 2. If the evidence in this case leaves in your mind a reasonable doubt that the defendant was present at 2145 S. Jefferson on May 5, 2012 at 9:55 p.m., then you must find the defendant not guilty.

> One of the issues in this case is whether the defendant was present at 2145 S. Jefferson on May 5, 2012. On that issue, you are instructed as follows:
> 1. The state has the bur[den] of proving beyond a reasonable doubt that the defendant was present at the time and place the offense is alleged to have been committed.

---

[35] 2145 South Jefferson was the address of Gwendolyn's home where the offenses were committed; 4898 San Francisco was the address of Appellant's home where he stayed with his grandmother.

[36] Both proposed instructions were patterned from MAI-CR 3d 308.04 (1-1-87), which is identical to its updated replacement, MAI-CR 4th 408.04 (7-1-17).

[37] Both proffered instructions included what Appellant's brief deems an "unfortunate misspelling": "burned" instead of "burden."

2. If the evidence in this case leaves in your mind a reasonable doubt that the defendant was present at 2145 S. Jefferson on May 5, 2012, then you must find the defendant not guilty.

Appellant's theory of defense at trial was that he was not at Gwendolyn's home at the time of the commission of the offenses, focusing specifically on the time of the fire. Appellant did not testify in his own defense; instead, he presented the testimony of a fire investigator and a network engineer in support of his alibi.

The fire investigator testified he was dispatched to the fire at 10:12 P.M. and arrived at 10:15 P.M. In relevant part, he opined that both fires were lit around the same time and that the fire was burning between five and forty minutes, but that he could not determine precisely how long it was burning. He determined the recliner in the living room was the likely origin of the second-floor fire, and was impeached with previous deposition testimony in which he opined that this fire was burning "probably not an hour. It was probably closer to five, ten minutes. Or fifteen minutes, maybe, at the most." The network engineer testified a call originated from Appellant's cellular telephone on May 5, 2012, at 9:55 P.M., which pinged off a cell tower located at 5025 San Francisco Avenue, and a ten-minute call at 10:04 P.M. also pinged off that same tower. He explained that, to make a call, a cellular telephone must connect to a cell tower and that every cell tower has a unique identifier. To "ping" off a tower while actively engaged in the activity of placing or receiving a call, the cellular telephone would likely be located within ten blocks of the tower; however, some cell towers can pick up a signal up to twenty miles away. In closing argument, defense counsel emphasized the alibi testimony, stating the fire was still burning at 10:15 P.M. when firefighters arrived, the fire could not have been burning for more

37

than 15 minutes, and the call at 9:55 P.M. from Appellant's telephone placed him in the vicinity of his home at 4898 San Francisco Ave. at that time.

*The trial court did not err in failing to issue the requested alibi instruction*

The trial court did not err in failing to issue Appellant's requested alibi instruction because he failed to present sufficient evidence establishing that his alibi covered the entire time of the commission of the crimes. An alibi instruction should not be given "unless there is supportive evidence that the defendant was somewhere other than the place of commission, during the *entire time* of commission." State v. Poe, 857 S.W.2d 419, 422 (Mo. App. E.D. 1993) (citing State v. Reese, 787 S.W.2d 768, 773 (Mo. App. W.D. 1990)). To warrant an alibi instruction, this evidence "must be sufficient to create a reasonable doubt in the average juror's mind as to the defendant's presence at the scene of the crime" during the relevant time period. Id. (citing Reese, 787 S.W.2d at 773).

In the present case, there was not sufficient evidence presented that, if believed, would demonstrate Appellant was not at the scene of the crimes during the entire time they were committed. The following evidence was adduced at trial relevant to the time of the commission of the crimes, and Appellant's whereabouts. All victims were alive and the apartment was not on fire when Teona left around 9:00 P.M., and Appellant was present at the apartment at that time. Two calls from Appellant's cellular telephone at 9:55 P.M. and 10:04 P.M. pinged off a cell tower located at 5025 San Francisco Ave. Appellant's grandmother testified Appellant was back at their shared home at 4898 San Francisco Ave. between 10:00 P.M. or 10:15 P.M. and 10:45 P.M. Firefighters were dispatched between "a little after" 10:00 P.M. and 10:12 P.M., and arrived at Gwendolyn's apartment within minutes, no later than 10:15 P.M. When they arrived, the

38

apartment was actively on fire. All fire investigators opined that it was not possible to state with specificity how long the fire was burning and there was no testimony adduced regarding a specific time by which the fires must have been—or could not have been—started. One fire investigator testified that "one indication that the fire was burning for a considerable amount of time … [was] the great amount of acidic soot accumulation throughout the building," while another testified he would "guess" the fire was burning between five and forty minutes.

The evidence supporting Appellant's alibi at most could establish that he was not at Gwendolyn's home at approximately 9:45 P.M. But given the whole picture of the evidence adduced at trial, Appellant could have shot Gwendolyn and Breiana, lit the two fires, and left by 9:45 P.M. Under such a scenario, the fires would have been burning for approximately 30 minutes at the time the firefighters arrived at the scene, which was within the range espoused by fire investigators.

The trial court did not err in refusing to give Appellant's alibi instruction because there was not supportive evidence adduced at trial, including the evidence presented by defense witnesses, establishing that Appellant was not at the scene of the crimes when the fires were started. See Poe, 857 S.W.2d at 422. Moreover, importantly, Appellant does not make any argument that his alibi evidence covered the time that Breiana and Gwendolyn were shot—which preceded the fires. See id. ("No alibi instruction will be given unless there is supportive evidence that the defendant was somewhere other than the place of commission, during the *entire time* of commission.") (citing Reese, 787 S.W.2d at 773).

39

*No prejudice from failure to give alibi instruction*

Even assuming *arguendo* that it was error for the trial court to fail to issue an alibi instruction, Appellant has not demonstrated he was prejudiced by this failure.

The jury heard evidence regarding Appellant's alibi defense, namely the probable length that the fire had been burning and that, at 9:55 P.M. on May 5, 2012, Appellant's cellular telephone initiated a call that pinged off a cell tower closer to Appellant's home than to Gwendolyn's home. The jury also had the benefit of defense counsel's closing argument, which emphasized this alibi defense. "An alibi instruction does not change the evidentiary picture or shift the burden of proof." McGuire v. State, 523 S.W.3d 556, 569 (Mo. App. E.D. 2017) (citing State v. Phegley, 826 S.W.2d 348, 355 (Mo. App. W.D. 1992). Even hearing this evidence and argument, the jury convicted Appellant of the three counts of first-degree murder, which necessarily required the jury to conclude Appellant was at the apartment at the time Gwendolyn and Breiana were shot and the fire that killed A.L. was started. On this record, it appears the jury did not believe Appellant's alibi evidence was sufficient to place him somewhere other than the scene of the crimes at the relevant time. We are not convinced there is a reasonable probability that the trial court's refusal to issue Appellant's proposed alibi instruction affected the outcome of trial. See Plunkett, 473 S.W.3d at 174; State v. Rickman, 920 S.W.2d 615, 618–19 (Mo. App. S.D. 1996).

Point VII is denied.[38]

---

[38] To the extent that Appellant argues a rule of fundamental fairness was violated because the State did not sufficiently specify a time span within which the crimes were alleged to have occurred, we disagree. The evidence here limited the relevant time span of the commission of the crimes to between the time Teona left the home at approximately 9:00 P.M. to when first responders were dispatched slightly after 10:00 P.M. This was not a time span that "place[d] an impossible burden on the defendant to offer evidence of his whereabouts over an extended period of time." See State v. Clark, 509 S.W.2d 740, 743 (Mo. App. K.C. 1974).

<u>Conclusion</u>

For the foregoing reasons, the judgment is affirmed.

_____
SHERRI B. SULLIVAN, J.

Angela T. Quigless, P.J., and
Laura Denvir Stith, Sp.J., concur.